2006 UT 29

**STATE of Utah, Plaintiff and Respondent,**

v.

**Cory VIRGIN, Defendant and Petitioner.**

**No. 20040715.**

Supreme Court of Utah.

May 16, 2006.

---

Mark L. Shurtleff, Att'y Gen., Kris Leonard, Asst. Att'y Gen., Salt Lake City, Troy S. Rawlings, Farmington, for plaintiff.

Larry R. Keller, Salt Lake City, for defendant.

DURRANT, Justice:

## INTRODUCTION

¶ 1 In this case, we review a magistrate's decision not to bind a defendant over for trial. The Defendant, Cory Virgin, was charged with aggravated sexual abuse of a child. After considering evidence at a preliminary hearing, the magistrate declined to bind Virgin over, concluding that the State had failed to establish the requisite probable cause that Virgin had committed the crime charged. The court of appeals reversed, determining that the State had submitted sufficient evidence to establish probable cause, as this court has defined that term. We now reverse the court of appeals and, in this opinion, address both the standard to be applied by magistrates in making bindover determinations and the standard to be applied by appellate courts in reviewing those determinations.

## BACKGROUND

¶ 2 The current petition arises from an alleged incident that occurred on March 6, 2000, when Rebecca Stewart and her then-boyfriend, Cory Virgin, babysat her four-year-old niece, M., and M.'s younger brother. The day after Stewart and Virgin babysat, M.'s mother heard M. using the words "penis" and "vagina." When asked, M. told her mother that she learned these words from Virgin. Then, while driving to St. George on the following day, M. told her mother that Virgin had "put his finger in her bottom."

¶ 3 Once in St. George, M.'s parents took her to the Washington County Children's Justice Center, where Dr. Kerri Smith interviewed and examined her. M. told Dr. Smith that she was in the bathroom when Virgin walked in and "took her underwear down." She said that Virgin "put his finger in her bottom" and pointed at her anus. M. explained that "it hurt when he did that but he took it out quickly." Next, she explained that Virgin told her he was going to get a picture to show her what a penis looked like; he did, and then he left. Dr. Smith performed a physical examination and a genital exam and found "no evidence of any abnormalities." Dr. Smith noted, however, that "a normal exam does not rule out the possibility of sexual abuse."

¶ 4 On March 9, 2000, after M.'s mother told Stewart about the accusations, Stewart wrote a statement at Virgin's request that described, in detail, their evening babysitting M. In the statement, Stewart notes that, during dinner, M. told of going rollerblading with her parents, and described her pink and

white, mermaid rollerblades. Later that night, M.'s mother confirmed to Stewart that M.'s account was untrue and indicated that M. did not have any rollerblades. Stewart's statement also notes two times where she left Virgin and M. alone for a short time while she went to the bathroom in the upstairs bathroom. Although Stewart's statement notes that Virgin went to the bathroom, it makes no mention of M. leaving at the same time.

¶ 5 On March 13, 2000, after the family returned to Salt Lake, Detective Scott Stevens interviewed M. at the Children's Justice Center ("2000 Interview"). In that interview, M. told Stevens that in the upstairs bathroom Virgin touched her with his finger on her bottom and that he talked about penises and vaginas. M. explained that, after she went to the bathroom, Virgin helped her button up her pants.

¶ 6 In the interview, M. also said that she, Virgin, and Stewart then went into her bedroom and played "[b]ottom," a game where "[y]ou tried to touch somebodies [sic] bottom when you ... you try to touch their pants and their bottom." M. stated that she told Stewart what Virgin did and that Stewart then told Virgin that he "did a no-no." During the interview, M. made no mention of Virgin showing her a picture of a penis and reported that Virgin had his clothes on the whole time. M. further stated that after the incident she went back downstairs and played Barbie.

¶ 7 After the interview, the detective from the City of North Salt Lake Police Department, attorneys from the County Attorney's Office, and the staff of the Children's Justice Center decided that there was insufficient evidence to bring a case. At some point thereafter, the police department destroyed the videotape of the 2000 Interview, retaining only a transcript.

¶ 8 In 2002, Detective Tylene Beckstrand reviewed the file and determined that the case "warranted activation and further investigation." After reactivating the case, Detective Beckstrand subpoenaed the records of Dr. Shireen M. Mooers, who had interviewed and examined M. on April 6, 2000. The records show that M. told Dr. Mooers that

Virgin touched her between her legs and showed her his penis.

¶ 9 Detective Beckstrand then set up another appointment at the Children's Justice Center and interviewed M. with Amy Graham, a Justice Center employee ("2002 Interview"). M. told Detective Beckstrand that she was playing Barbie and went upstairs to use the bathroom. She said that Virgin touched her bottom while she was pulling up her pants. She did not say that Virgin talked about or showed her pictures of a penis or vagina. M. reported that Virgin "ha[d] his clothes on the whole time" and "[d]id [not] show [her] any parts of his body." M. described the bathroom where the incident took place, but her description did not match the bathroom in her old house, which is where the alleged abuse took place.

¶ 10 Virgin was charged with aggravated sexual abuse of a child. Utah Code Ann. § 76–5–404.1 (2003). The court held a preliminary hearing with the Honorable Darwin C. Hansen acting as magistrate. The court heard testimony from Detective Stevens, Detective Beckstrand, and Stewart. The court also reviewed the transcript from the 2000 Interview, the tape from the 2002 Interview, and Dr. Smith's and Dr. Mooers's medical reports.

¶ 11 At the preliminary hearing, Stewart, who was no longer dating Virgin, testified that she did not know if the abuse happened but that at some time that night, while M., Stewart, and Virgin were playing with blocks and Barbies, Virgin went upstairs to use the restroom. She said that M. then went upstairs to look for Barbie clothes and that, "if it did happen[,] it would have been right there when [Virgin] went to use the bathroom and [M.] excused herself to go get Barbie clothes." Stewart also testified, however, that when M. returned to play with her Barbies, she did not appear distressed, and Stewart specifically denied M.'s claim that M. had told her that night of the alleged abuse.

¶ 12 Stewart also denied having played the "bottom" game that M. described in the 2000 Interview. Detective Beckstrand acknowledged that Stewart did not touch M.'s bottom, and both Detective Stevens and Detec-

tive Beckstrand testified that they did not investigate Stewart for any crime. In her testimony, Stewart surmised that M.'s parents accepted that M.'s account about the "bottom" game was untrue because they "know[ ] me and ... know[ ] I wouldn't do that."

¶ 13 The magistrate declined to bind Virgin over for trial and dismissed the information against Virgin without prejudice. In his order denying bindover, the magistrate stated that "the evidence lack[ed] sufficient credibility and reliability to form a reasonable belief that the alleged offense occurred and thus is wholly lacking and incapable of any reasonable inference that would support a bind-over."

¶ 14 The State appealed the magistrate's dismissal of the information against Virgin, and the Utah Court of Appeals reversed the magistrate's dismissal. *State v. Virgin,* 2004 UT App 251, ¶ 21, 96 P.3d 379. The court of appeals, upon review of the record, concluded that the evidence was sufficient to establish probable cause that Virgin committed the crime and remanded with instructions that he be bound over for trial. *Id.*

## STANDARD OF REVIEW

¶ 15 On certiorari, we review the court of appeals' decision for correctness. *State v. Orr,* 2005 UT 92, ¶ 7, 127 P.3d 1213 (citing *Allstate Ins. Co. v. Wong,* 2005 UT 51, ¶ 12, 122 P.3d 589). "Our review extends no further than to determine whether the court of appeals accurately reviewed the trial court's decision under the appropriate standard of review." *Id.*

¶ 16 In deciding this case, we must address three issues: (1) the appropriate legal standard for a preliminary hearing; (2) whether magistrates' bindover determinations are entitled to any deference on appeal; and (3) whether, under the specific facts of this case, the magistrate acted within his discretion when he declined to bind Virgin over for trial. The first two questions are questions of law, which we review for correctness. *Monticello v. Christensen,* 788 P.2d 513, 516 (Utah 1990). As we discuss at length in Part II of the Analysis, the third

question is a mixed question of law and fact to which we grant some deference. We will discuss each of these questions in turn.

## ANALYSIS

I. TO ALLOW BINDOVER, THE PROSECUTION'S EVIDENCE MUST SUPPORT A REASONABLE BELIEF THAT THE DEFENDANT COMMITTED THE CRIME

¶ 17 We first discuss the appropriate legal standard to be applied at a preliminary hearing. Although there has been some confusion over the standard, we reaffirm our conclusion in *State v. Clark* that the appropriate standard is probable cause. 2001 UT 9, ¶ 10, 20 P.3d 300. In order to establish probable cause, the prosecution must produce evidence sufficient to support a reasonable belief that the defendant committed the charged crime. *Id.* ¶ 16.

¶ 18 The confusion over this standard predates *Clark. Id.* ¶ 11. Before *Clark,* this court tried multiple times to articulate a standard of proof that fell "somewhere between the reasonable belief necessary to support a warrant and the preponderance of the evidence standard applicable in the civil context." *Id.* But these efforts only resulted in confusion. *Id.* ¶ 16. Consequently, we abandoned any effort to articulate an intermediate standard and in *Clark* held, in essence, that probable cause means probable cause. *See id.* In other words, the probable cause that the prosecution must establish in a preliminary hearing pursuant to rule 7 of the Utah Rules of Criminal Procedure, Utah R.Crim. P. 7(i)(1)(i)(2) (allowing bindover where a "magistrate finds *probable cause* to believe that ... defendant has committed [the crime]" (emphasis added)), is the same as the probable cause that the prosecution must show to obtain an arrest warrant, *id.* 6(a) (allowing issuance of an arrest warrant or summons where "there is *probable cause* to believe that ... the accused has committed [the crime]" (emphasis added)). We explained in *Clark* that there is "no principled basis for attempting to maintain a distinction between the arrest warrant probable cause standard and the preliminary hearing proba-

ble cause standard." 2001 UT 9, ¶ 16, 20 P.3d 300. Thus, in both instances, "the prosecution must present sufficient evidence to support a reasonable belief." *Id.* As we stated in *Clark,* this " 'reasonable belief' standard has the advantage of being ... easily understood while still allowing magistrates to fulfill the primary purpose of the preliminary hearing, 'ferreting out ... groundless and improvident prosecutions.' " *Id.* (quoting *State v. Anderson,* 612 P.2d 778, 783–84 (Utah 1980) (alteration in original)).

¶ 19 Despite this court's attempt to simplify the standard for preliminary hearings, some confusion remains. In this case, the court of appeals expressed concern that, "[w]hile [the Utah Supreme Court] has held that 'the magistrate's role in this process ... is not that of a rubber stamp for the prosecution,' the very limited discretion afforded a magistrate under existing case law suggests otherwise." *State v. Virgin,* 2004 UT App 251, ¶ 20 n. 5, 96 P.3d 379 (quoting *Clark,* 2001 UT 9, ¶ 10, 20 P.3d 300) (third alteration in original). The court of appeals then suggested that this court "revisit the narrow discretion afforded magistrates in determining whether to bind a defendant over for trial." *Id.* The court of appeals underestimates the breadth of the discretion afforded magistrates by the probable cause standard we set forth in *Clark.* That discretion is not so narrow as the court of appeals has interpreted it to be. Properly construed and applied, the probable cause standard does not constitute a rubber stamp for the prosecution but, rather, provides a meaningful opportunity for magistrates to ferret out groundless and improvident prosecutions. We take this opportunity to reaffirm and elucidate the boundaries of the probable cause standard in the preliminary hearing context.

¶ 20 First, the standard serves to ferret out groundless and improvident prosecutions at the preliminary hearing stage. Under the probable cause standard, the prosecution has the burden of producing "believable evidence of all the elements of the crime charged," but this evidence does not need to be "capable of supporting a finding of guilt beyond a reasonable doubt."

*Clark,* 2001 UT 9, ¶ 15, 20 P.3d 300 (internal quotation marks omitted). As we have explained, "The fundamental purpose served by the preliminary examination is the ferreting out of groundless and improvident prosecutions." *Anderson,* 612 P.2d at 783–84. This "relieves the accused from the substantial degradation and expense incident to a modern criminal trial when the charges against him are unwarranted or the evidence insufficient." *Id.* at 784. Under *Clark,* "the prosecution must present sufficient evidence to support a reasonable belief that an offense has been committed and that the defendant committed it." 2001 UT 9, ¶ 16, 20 P.3d 300.

¶ 21 The bindover standard is intended to leave the principal fact finding to the jury. *See State v. Talbot,* 972 P.2d 435, 438 (Utah 1998) (explaining that a preliminary hearing "is not a trial on the merits, only a gateway to the finder of fact"). But the standard nevertheless gives magistrates discretion to discontinue groundless prosecutions. Under current law, magistrates may decline bindover if the prosecution fails to present sufficiently credible evidence on at least one element of the crime. *Clark,* 2001 UT 9, ¶ 15, 20 P.3d 300. Moreover, magistrates are free to decline bindover where the facts presented by the prosecution provide no more than a basis for speculation—as opposed to providing a basis for a reasonable belief. *See State v. Hester,* 2000 UT App 159, ¶¶ 14–17, 3 P.3d 725.

¶ 22 The key word that elevates magistrates' role beyond that of a mere rubber stamp for the prosecution is "reasonable." Indeed, the prosecution has not carried its burden if it merely shows belief rather than *reasonable* belief. Inclusion of the word "reasonable" in this standard suggests that, at some level of inconsistency or incredibility, evidence becomes incapable of satisfying the probable cause standard. When that is the case, magistrates are empowered to deny bindover.

¶ 23 Second, in their efforts to ferret out groundless prosecutions, magistrates may also make some limited credibility determinations at the preliminary hearing. Much of

the debate between the parties in this case in the briefs and at oral argument focused on how much freedom magistrates have to make credibility determinations. The State argues that a magistrate's authority to make credibility determinations is limited to an ability to disregard testimony that cannot possibly be true. Virgin argues that limiting magistrates' ability to make credibility determinations to the degree argued by the State undermines their ability to ferret out groundless prosecutions and converts preliminary hearings to rubber stamps for the prosecution. The court of appeals agreed with the State and concluded that the magistrate exceeded its authority in finding that M.'s testimony was not credible, but also agreed with Virgin that this conclusion essentially converts a magistrate into a rubber stamp. *State v. Virgin*, 2004 UT App 251, ¶ 20 & n. 5, 96 P.3d 379. We take this opportunity to further describe the bounds of a magistrate's authority to assess credibility.

 ¶ 24 Magistrates may make credibility determinations in preliminary hearings, but the extent of those determinations is limited. In *Talbot*, we recognized that assessing " 'the credibility of the witnesses [in a preliminary hearing] is an important element in the determination of probable cause' " and that preventing magistrates from making credibility determinations "would undermine the 'fundamental purpose served by the preliminary examination.' " 972 P.2d at 438 (quoting *Anderson*, 612 P.2d at 783–84, 786). Indeed, that the probable cause standard demands "reasonable belief" rather than merely "belief" strongly suggests that magistrates must, to a certain extent, assess the credibility of the evidence presented. *See Clark*, 2001 UT 9, ¶ 16, 20 P.3d 300 (holding that "the prosecution must present sufficient evidence to support a *reasonable* belief that" defendant committed a crime (emphasis added)). Nevertheless, we have also noted that "the magistrate's evaluation of credibility at a preliminary hearing is lim-

ited to determining that 'evidence is wholly lacking and incapable of reasonable inference to prove some issue which supports the [prosecution's] claim.' " *Talbot*, 972 P.2d at 438 (quoting *State v. Pledger*, 896 P.2d 1226, 1229 (Utah 1995)) (alteration in original). Essentially, magistrates may only disregard or discredit evidence that is "wholly lacking and incapable of" creating a reasonable inference regarding a portion of the prosecution's claim. *Id.* It is inappropriate for a magistrate to weigh credible but conflicting evidence at a preliminary hearing as a preliminary hearing "is not a trial on the merits" but "a gateway to the finder of fact." *Id.* Therefore, magistrates must leave all the weighing of credible but conflicting evidence to the trier of fact[1] and must "view the evidence in a light most favorable to the prosecution[,] resolv[ing] all inferences in favor of the prosecution." *Id.* (citing *Pledger*, 896 P.2d at 1229).

¶ 25 In sum, we hold that magistrates' ability to make credibility determinations is not limited to only disregarding testimony that cannot possibly be true. Rather, although magistrates may not prefer one piece of credible evidence over a conflicting piece of credible evidence in making their bindover determination, they may disregard or discount as incredible evidence that is not capable of supporting a reasonable belief as to an element of the prosecutor's claim. In other words, when evidence becomes so contradictory, inconsistent, or unbelievable that it is unreasonable to base belief of an element of the prosecutor's claim on that evidence, magistrates need not give credence to that evidence.

## II. MAGISTRATES' BINDOVER DETERMINATIONS ARE ENTITLED TO SOME DEFERENCE

 ¶ 26 We next address whether magistrates' bindover determinations are entitled to any deference. We have previously held

---

1. Allowing magistrates to weigh credible but conflicting evidence at a preliminary hearing would effectively grant them more authority to weigh evidence than a trial judge. *See Cruz v. Montoya*, 660 P.2d 723, 729–30 (Utah 1983) (explaining that a trial judge may not direct a ver-

dict for the defendant "[u]nless the evidence is wholly lacking and incapable of reasonable inference to prove some issue which supports the plaintiff's claim"), *superseded by statute on other grounds as stated in State v. McBride*, 940 P.2d 539, 545 (Utah Ct.App.1997).

in a number of cases that the decision to bind a criminal defendant over for trial is a question of law, which we review without deference to the decision below. *State v. Schroyer*, 2002 UT 26, ¶ 8, 44 P.3d 730; *State v. Hawatmeh*, 2001 UT 51, ¶ 13, 26 P.3d 223; *State v. Clark*, 2001 UT 9, ¶ 8, 20 P.3d 300; *accord State v. Jaeger*, 896 P.2d 42, 44 (Utah Ct.App.1995); *see also State v. Talbot*, 972 P.2d 435, 437–39 (Utah 1998) (reviewing evidence with no apparent deference to magistrate); *State v. Pledger*, 896 P.2d 1226, 1229–30 (Utah 1995) (same). In those cases, we have set forth this standard of review without fully exploring the issue pursuant to the mixed-question analysis we outlined in *State v. Pena*, 869 P.2d 932, 938–40 (Utah 1994). We take the opportunity to do so here and conclude that, in reviewing a magistrate's bindover decision, an appellate court should afford the decision limited deference.

¶ 27 As we explained in *Pena*, mixed questions of law and fact require the application of a stated rule of law to a specific fact scenario. *See id.* at 936. This case presents us with a mixed question because a decision to bind a defendant over for trial includes the application of the appropriate bindover standard to the facts presented in each case. Identifying the issue before us as a mixed question is important because such questions occasionally "embod[y] a de facto grant of discretion" to lower courts. *Id.* at 937. This discretion breeds deference. Where lower courts have discretion, appellate courts should grant them commensurate deference. In effect, this discretion allows district courts a measure of freedom "to reach one of several possible conclusions about the legal effect of a particular set of facts without risking reversal." *Id.* at 937.

¶ 28 Thus, to determine the level of deference that we should afford a lower court's decision, we must determine the degree of discretion that the lower court has in making that decision. Because the amount of discretion varies according to the nature of the issue being decided, *id.*, we quantify that discretion by weighing the following factors: (1) whether "the facts to which the legal rule is to be applied are so complex and varying that no rule adequately addressing the rele-

vance of all these facts can be spelled out," *id.* at 939; (2) whether "the situation to which the legal principle is to be applied is sufficiently new to the courts that appellate judges are unable to anticipate and articulate definitively what factors should be outcome determinative," *id.;* (3) whether "the trial judge has observed 'facts,' such as a witness's appearance and demeanor, relevant to the application of the law that cannot be adequately reflected in the record available to appellate courts," *id.;* and (4) whether there are policy reasons that weigh for or against granting discretion to district courts, such as when substantial constitutional rights are implicated, *see id.* at 938–39 (recognizing the interest of "having uniform legal rules regarding consent to search, given the substantial Fourth Amendment interests lost as a result of such consents," as a policy reason opposing a grant of discretion to the district court); *see also State v. Brake*, 2004 UT 95, ¶¶ 14–15, 103 P.3d 699.

¶ 29 In this case, a consideration of the these factors weighs in favor of granting a limited degree of discretion to magistrates in the context of preliminary hearings. First, while the facts surrounding the myriad cases brought in this context may not all be complex, they are sure to be varying, which makes it difficult to articulate a rule that adequately accounts for all the variations that arise under each fact scenario. Also, a de novo review of fact-sensitive cases could create confusing and inconsistent case law. *See Pena*, 869 P.2d at 938. Accordingly, the first factor weighs in favor of granting magistrates discretion.

¶ 30 Second, while the preliminary hearing context is not new, applying a probable cause standard in that context arguably is. Yet given the familiarity of the probable cause standard, appellate courts could still anticipate which factors should be outcome determinative. In 2001, we announced that the bindover probable cause standard would be the same as the probable cause standard in the arrest warrant context. *Clark*, 2001 UT 9, ¶ 16, 20 P.3d 300. While the application of this standard in the preliminary hearing context was a significant change, the concept of probable cause is a familiar one to magis-

trates. This weighs in favor of limiting magistrates' discretion.

¶ 31 Third, preliminary hearings are such that magistrates are in a position to observe and assess witness demeanor and credibility. Preliminary hearings are adversarial in nature,[2] and a defendant has the "opportunity to attack the prosecution's evidence and to present any affirmative defenses." *State v. Anderson*, 612 P.2d 778, 783 (Utah 1980). "Although the hearing is not a trial per se, it is not an ex parte proceeding nor one-sided determination of probable cause, and the accused is granted a statutory right to cross-examine the witnesses against him, and the right to subpoena and present witnesses in his defense." *Id.* (footnotes omitted). Magistrates preside over these proceedings and may decline to bind a defendant over for trial if the prosecution fails to present evidence that would support a reasonable belief that the crime was committed and that the defendant committed it. *Clark*, 2001 UT 9, ¶ 16, 20 P.3d 300. As discussed above, *supra* ¶¶ 23–25, making limited credibility determinations is an important part of this decision. *State v. Talbot*, 972 P.2d 435, 438 (Utah 1998). The magistrate's role in observing witness demeanor and credibility is, however, limited to determining whether evidence is wholly incapable of supporting a reasonable belief as to a part of the prosecution's case. *See id.* at 438. Thus, although magistrates' discretion is restricted because of the limited nature of the credibility determinations they make in this context, their proximity to the facts of the case weighs in favor of granting them some discretion in bindover decisions.

¶ 32 Finally, policy considerations favor giving magistrates some discretion. In *State v. Thurman*, 846 P.2d 1256 (Utah 1993), we concluded that affording no deference to a district court's ultimate voluntariness conclusion in a Fourth Amendment "consent to search" context promoted uniformity throughout the state and more effectively "fix[ed] the limits of acceptable police behav-

ior." *Id.* at 1271; *accord Brake*, 2004 UT 95, ¶¶ 14–15, 103 P.3d 699 (expanding nondeferential review to all search and seizure cases based on policy considerations). While uniformity and clarity in the law are always worthy goals, granting no deference in the bindover context does not necessarily promote those goals. As we pointed out in *Pena*, in highly fact-dependant questions, de novo review can sometimes lead to incoherent and unclear statements of the law. 869 P.2d at 938. Furthermore, in *Thurman*, we were motivated towards uniformity to inform police of "the limits of acceptable ... behavior," thereby limiting Fourth Amendment violations. *See* 846 P.2d at 1271. No similar motive exists in the preliminary hearing context.

¶ 33 As an additional policy consideration, we have noted in the past and we reiterate today that magistrates have an important role in ferreting out groundless prosecutions before they go to trial. *State v. Anderson*, 612 P.2d 778, 783–84 (Utah 1980); *supra* ¶¶ 20–22. Severely limiting magistrates' discretion could undermine this role because the probable cause standard already favors the prosecution, *see Talbot*, 972 P.2d at 437–38 (explaining that a magistrate must "resolve all inferences in favor of the prosecution" (internal quotation marks omitted)), and restricting discretion would give magistrates an incentive to be a "rubber stamp for the prosecution" in order to minimize the possibility of reversal. In other words, because the probable cause standard favors the prosecution, all other factors being equal, reversal of magistrates' decisions is more likely if they decline bindover. As a result, severely limiting magistrates' discretion in applying the probable cause standard may have the unintended consequence of causing them to unjustly bind a defendant over where they would not have otherwise in order to reduce the possibility of reversal.

¶ 34 After balancing these factors, we conclude that magistrates should have some

---

2. The adversarial nature of the preliminary hearing, however, has been somewhat reduced by the Utah constitutional amendment that now "allow[s] for the admission of reliable hearsay evidence at preliminary examinations." *Clark*,

2001 UT 9, ¶ 16 n. 3, 20 P.3d 300 (citing Utah Const. art. I, § 12; Utah R.Crim. P. 7(h)(2); Utah R. Evid. 1102) (internal quotation marks omitted).

discretion in making their bindover determinations. Because the many potential fact scenarios in the preliminary hearing context make it difficult for appellate courts to make and consistently apply, under de novo review, a rule that adequately accounts for each varied fact scenario, and because of magistrates' proximity to the facts of each case, magistrates should have some discretion to apply the probable cause standard to those facts. This discretion is limited, however, because in the bindover context a magistrate's authority to make credibility determinations is limited. Accordingly, an appellate court should grant commensurate limited deference to a magistrate's application of the bindover standard to the facts of each case.

## III. THE MAGISTRATE IN THIS CASE ACTED WITHIN HIS DISCRETION IN DECLINING TO BIND VIRGIN OVER FOR TRIAL

¶ 35 With these principles in mind, we turn to the facts of this case. Granting some deference to the magistrate's decision, we conclude that the magistrate acted within his discretion in finding the prosecution's evidence insufficient to support a reasonable belief that the alleged crime occurred and in refusing to bind Virgin over for trial. In his order denying bindover, the magistrate stated that "the evidence lack[ed] sufficient credibility and reliability to form a reasonable belief that the alleged offense occurred and thus is wholly lacking and incapable of any reasonable inference that would support a bind-over." The magistrate explained that "[t]he only evidence in support of the alleged touching came from the child herself in two separate statements—the first when she was age 3 and the second when she was age 6" and that "[t]here was a multitude of inconsistencies between those statements and the statements and testimony of third-party witnesses."

¶ 36 Upon review of the facts of this case and applying the appropriate level of deference, we cannot say that the magistrate exceeded his discretion in refusing to bind Virgin over for trial. The only evidence that Virgin committed the crime came from M.'s testimony. Stewart testified only as to opportunity, and even as to that issue her testimony contradicted her earlier statement. Stewart's account given during the preliminary hearing that Virgin and M. were upstairs at the same time without her is conspicuously absent from her detailed written statement made three days after the alleged incident. Accordingly, the case turns on whether M.'s testimony was so inconsistent, contradictory, or incredible as to render it insufficient to support a reasonable belief that Virgin committed the crime.

¶ 37 We conclude that the magistrate acted within his discretion in concluding that it was. M.'s statements were inconsistent and contained a significant portion that was uniformly disbelieved. Her statements regarding what happened in the bathroom after the alleged abuse are particularly inconsistent. For example, in her interview with Dr. Smith, M. reported that Virgin showed her a picture of a penis, but in her interview with the Dr. Mooers, M. said that Virgin exposed himself to her. In the 2000 Interview, M. said that Virgin just talked about penises and vaginas, but in the 2002 Interview, M. said nothing about learning these words. Finally, in both the 2000 and 2002 Interviews, M. stated that Virgin had his clothes on the whole time, and in the 2002 interview, M. stated that Virgin "[d]id [not] show [her] any parts of his body." Furthermore, testimony established that M. did not appear disturbed or distraught at any time throughout the night in question. Perhaps most significant is the fact that M. reported that two separate incidents of possible sexually-oriented conduct occurred on the night in question—Virgin's alleged touching in the bathroom, which is the subject of this case, and a game with Virgin and Stewart in M.'s bedroom that involved trying to touch one another's bottom. But the account of Stewart and Virgin playing the "bottom" game with M. is universally disbelieved. Given these and other inconsistencies in the record, we conclude that the magistrate acted within his discretion in finding the evidence insufficient to support a reasonable belief that the crime was committed and that Virgin committed it.

¶ 38 In making this decision, we emphasize that this is a unique case. We do not intend this case to close the door to cases based on the testimony of young children. We are sensitive to the fact that child sexual abuse cases often rest solely on the testimony of a young child. We also recognize that it is not unusual that a child's testimony be somewhat inconsistent, especially in sexual abuse cases. This case is made unique, however, by the fact that Stewart's testimony about when the alleged incident could have occurred contradicted her previous statement; by the fact that M. made other allegations of sexual misconduct that were disbelieved; and by the fact that M.'s testimony, the only evidence that the crime was committed, contained multiple inconsistencies, in part, because the filing of the case was delayed for over two years.

## CONCLUSION

¶ 39 The preliminary hearing "probable cause" standard requires that the prosecution present evidence sufficient to support a reasonable belief that the defendant committed the crime charged. If the evidence presented is so inconsistent, contradictory, or incredible as to be insufficient to support such a reasonable belief, magistrates have the discretion to decline bindover. We conclude that in this case the magistrate acted within his discretion in so doing. We reverse the court of appeals' decision and order that the charges against Virgin be dismissed without prejudice.

¶ 40 Chief Justice DURHAM, Associate Chief Justice WILKINS, Justice PARRISH, and Justice NEHRING concur in Justice DURRANT'S opinion.