2006 UT App 232

STATE of Utah, Plaintiff and Appellant,

v.

Deborah WALLACE, Defendant and Appellee.

No. 20050190–CA.

Court of Appeals of Utah.

June 8, 2006.

**600**

Mark L. Shurtleff, Attorney General and Kenneth A. Bronston, Asst Attorney General, Salt Lake City, for Appellant.

Aaron P. Dodd, Fillmore Spencer LLC, Provo, for Appellee.

Before Judges McHUGH, ORME, and THORNE.

## OPINION

McHUGH, Judge:

¶ 1 The State appeals the magistrate's refusal to bind Defendant Deborah Wallace (Wallace) over on a charge of issuing a bad check or draft to Morris Murdock Travel (Morris Murdock). *See* Utah Code Ann. § 76–6–505(1) (2003). We reverse.

## BACKGROUND

¶ 2 In October 2003, an information was filed against Wallace and her husband (the Wallaces) that contained multiple charges, including one count of issuing a bad check or draft.[1] *See id.* This one count of issuing a bad check or draft is the only subject of the State's appeal.

¶ 3 On April 7, 2004, the Wallaces' preliminary hearing was held before a magis-

---

1. The information charged Wallace with two counts of issuing a bad check or draft, two counts of communications fraud, and one count of engaging in a pattern of unlawful activity. In the same information, Wallace's husband was charged with two counts of theft by deception, two counts of communications fraud, one count of issuing a bad check or draft, and one count of engaging in a pattern of unlawful activity.

trate.[2] The State presented evidence at the hearing concerning a transaction that took place on July 18, 2002, between Wallace and Morris Murdock.[3] The State relied on the testimony of Sharon Warner, a Morris Murdock employee. On July 18, 2002, Wallace called Warner and indicated that she was interested in purchasing eleven airline tickets for travel to Hawaii on the following day. Warner provided the tickets, but because Wallace did not have a credit card, she asked for payment in cash. Wallace told Warner that she did not currently have the money needed to pay for the tickets but would receive an adequate amount of cash on the following Tuesday. Wallace then asked Warner to take a check that was postdated to the following Tuesday so that Wallace could deposit the funds she claimed she was expecting to receive to cover the check. Later that day, the Wallaces delivered a check for $11,496.30 to Warner. Although Wallace had indicated that she was going to postdate the check, she in fact predated it to July 17, 2002. The Wallaces departed for Hawaii the following day.

¶ 4 Although the check was actually predated, Warner waited until the following Tuesday to cash it. When she called the bank that day, she learned that there were insufficient funds in the account to cover the check. Warner then called Wallace in Hawaii and expressed concern over the insufficient funds. According to Warner, Wallace responded, "Oh, the money is coming any time. Just hold off a few more days." As directed, Warner waited several more days, then called the bank again, only to discover that there were still insufficient funds to cover the check. Similar exchanges of this nature—Warner calling to find out when the check would clear, Wallace responding that she had "a big amount" of money coming in soon to cover the check, and Warner being told by the bank that there were insufficient funds in the account to cover the check— went on for several weeks. At some point,

Warner became "nervous" because she had been waiting to negotiate the check for so long and decided to deposit the check into Morris Murdock's account. When the check was returned for insufficient funds, the matter was turned over to Morris Murdock's legal department.

¶ 5 The State also presented the testimony of Lynette Ambrose, a paralegal in Morris Murdock's legal department. Ambrose indicated that she spoke with Wallace multiple times in an effort to collect on the check. During her involvement with the matter, Ambrose discovered that the Wallaces had also sent two checks to Morris Meetings, a subsidiary of Morris Murdock, to cover admission fees for a convention, both of which were also returned for insufficient funds.

¶ 6 In addition to evidence concerning the charge that is the subject matter of this appeal, the State presented evidence at the preliminary hearing relating to the other charges filed against the Wallaces. Toby O'Bryant, a white-collar crime investigator, testified, providing an overview of the State's case against the Wallaces. On November 4, 2002, O'Bryant met with several individuals who, as a result of their dealings with the Wallaces, had been "relieved of some money in one fashion or another, some by insufficient funds checks, some by borrowing the money and not paying it back as promised." The individuals at that meeting, along with other persons and business entities, indicated to O'Bryant that the Wallaces owed them, collectively, more than $450,000. O'Bryant subpoenaed fourteen of the Wallaces' bank accounts and examined twelve of those accounts. All but one of those accounts existed for only one or two years. O'Bryant indicated that these accounts had "accumulated a number of returned checks [and] overdraft and bank fees," and had "deficits in closing amounts when they were terminated by the banks." The evidence established that, over

2. Although the magistrate conducted a joint preliminary hearing for both Wallace and her husband, Wallace's husband is not a party to this appeal.

3. This appeal is from the trial court's refusal to bind the Wallaces over for trial after a preliminary hearing. We therefore view the evidence presented by the State, and all reasonable inferences therefrom, "in a light most favorable to the prosecution." *State v. Virgin*, 2006 UT 29, ¶ 24 (quotations and citations omitted); *see also State v. Clark*, 2001 UT 9, ¶ 10, 20 P.3d 300.

a period of approximately two years ending in July 2002, a total of 254 checks were returned on these accounts.

¶ 7 Edward Martinez testified that on July 2, 2001, he and his father-in-law each loaned Wallace's husband $10,000, which he agreed to repay in ninety days, with interest. Wallace's husband did not repay the loans on their due date. Thereafter, Martinez asked the Wallaces about the loans on numerous occasions, and the Wallaces always responded by telling Martinez that they had a "big deal" coming in during the next several weeks and that they would repay Martinez and Martinez's father-in-law at that time. Although Martinez finally received a check for $10,000 from the Wallaces on December 4, 2001, he was still owed interest on the loan. On July 17, 2002, Martinez and his father-in-law happened to be driving by the Wallaces' residence and noticed that it appeared as though the Wallaces were moving. When Martinez and his father-in-law stopped and confronted the Wallaces, the Wallaces admitted that they were moving to Hawaii. Martinez and his father-in-law told the Wallaces that they would like to be repaid on the loans before the Wallaces moved. Wallace then wrote Martinez two checks, totaling approximately $3300, and wrote Martinez's father-in-law two checks, totaling approximately $13,000. Defendant dated these checks "July 17, 2002," but asked Martinez and his father-in-law not to cash them until the following "Tuesday or Wednesday" because the Wallaces " '[w]ould have plenty of money in [the account]' " by then. When Martinez and his father-in-law attempted to cash the checks several days after the date identified by Defendant, all but one were returned for insufficient funds.

¶ 8 Jeanne Stonely also testified at the preliminary hearing, providing the details of a 1996 transaction in which she and her husband (the Stonelys) financed the sale of their home to the Wallaces. Stonely testified that sometime soon thereafter, the Wallaces began to fall short on their payments and missed some payments entirely. Stonely contacted the Wallaces about these short or missed payments, but the Wallaces "always convinced [her] that ... [the money] would

be coming." Eventually, the Stonelys discovered that the Wallaces had abandoned the house. As a result, they hired an attorney to help them regain possession of the home. After the Wallaces deeded the house back to the Stonelys, the Stonelys expended several thousand dollars on repairs, cleaning, yard work, and unpaid property taxes. Stonely testified that the Wallaces' short and missed payments totaled more than $50,000.

¶ 9 At the conclusion of the preliminary hearing, the magistrate took under advisement the matter of whether to bind Wallace over for trial. Thereafter, Wallace filed a motion to dismiss all the charges against her. Following a hearing on Wallace's motion, the magistrate dismissed all the charges against Wallace, including the charge at issue in this case, stating:

> This [c]ourt finds that the State failed to present evidence sufficient to establish probable cause to satisfy the essential element of misrepresentation.
>
> This [c]ourt finds that the State supports its motion by showing [Wallace] wrote the checks with the knowledge that there would be insufficient funds based upon the Wallaces' history of debt. However, there was ample testimony at the preliminary hearing that the [Wallaces] were expecting to receive a substantial amount of money from an investment[,] and there was no evidence presented by the State contrary to this representation. [Wallace] does not carry the burden at the preliminary hearing to provide evidence of the large payout, but rather this burden rests solely upon the State to present some evidence that the [Wallaces] were engaging in fraud by misrepresenting the statement of expecting a substantial sum of money arriving from a business deal. The State must establish sufficient evidence that the Wallaces were not relying on receiving money themselves in order to provide the sufficient funds. The State must provide "some" evidence that [Wallace]'s expectation of receiving money was a misrepresentation[,] and the State can not meet its burden by merely presenting evidence of insufficient funds and a failure to pay.

After the magistrate granted Wallace's motion to dismiss, the State filed a motion to reconsider, which the magistrate denied. The State appeals.

## ISSUE AND STANDARD OF REVIEW

■ ¶ 10 The State argues that the magistrate incorrectly interpreted and applied section 76-6-505(1) and, as a result, erred by refusing to bind Wallace over on the charge of issuing a bad check to Morris Murdock. *See* Utah Code Ann. § 76-6-505(1). "The proper interpretation and application of a statute is a question of law [that] we review for correctness, affording no deference to the magistrate's legal conclusions." *State v. One Lot of Pers. Prop.*, 2004 UT 36,¶ 8, 90 P.3d 639 (quotations and citations omitted). The Utah Supreme Court recently held that a magistrate's bindover decision is a mixed question of law and fact, *see State v. Virgin*, 2006 UT 29,¶ 27, 137 P.3d 787, and that magistrates have "some discretion in making their bindover determinations," *id.* at ¶ 34. Accordingly, we grant "limited deference to a magistrate's application of the bindover standard to the facts of each case." *Id.*

## ANALYSIS

¶ 11 The State asserts that the magistrate incorrectly interpreted and applied section 76-6-505(1) and, as a result, erred by refusing to bind Wallace over on the charge of issuing a bad check to Morris Murdock. *See* Utah Code Ann. § 76-6-505(1). To serve as a backdrop for our analysis under section 76-6-505(1), we first set forth the standard for binding over a defendant in a criminal case.

¶ 12 In *State v. Clark*, 2001 UT 9, 20 P.3d 300, the Utah Supreme Court stated that:

> To bind a defendant over for trial, the State must show probable cause at a preliminary hearing by presenting sufficient evidence to establish that the crime charged has been committed and that the defendant has committed it. At this stage of the proceeding, the evidence required [to show probable cause] ... is relatively low because the assumption is that the prosecution's case will only get stronger as the investigation continues. Accordingly, when faced with conflicting evidence, the magistrate may not sift or weigh the evidence ... but must leave those tasks to the fact finder at trial. Instead, the magistrate must view all evidence in the light most favorable to the prosecution and must draw all reasonable inferences in favor of the prosecution. Yet, the magistrate's role in this process, while limited, is not that of a rubber stamp for the prosecution.... Even with this limited role, the magistrate must attempt to ensure that all groundless and improvident prosecutions are ferreted out no later than the preliminary hearing.

*Id.* at ¶ 10 (alterations in original) (quotations and citations omitted). The *Clark* court proceeded to address the quantum of evidence the prosecution is required to produce to bind a defendant over for trial, *see id.* at ¶¶ 11–16, and held that there was "no principled basis for attempting to maintain a distinction between the arrest warrant probable cause standard and the preliminary hearing probable cause standard," *id.* at ¶ 16. The Utah Supreme Court recently revisited *Clark* in *Virgin*, 2006 UT 29, reaffirming that to prevail at a preliminary hearing, "the prosecution must present sufficient evidence to support a reasonable belief that an offense has been committed and that the defendant committed it." *Id.* at ¶ 20 (quotations and citations omitted). The court emphasized that "the probable cause standard does not constitute a rubber stamp for the prosecution but, rather, provides a meaningful opportunity for magistrates to ferret out groundless and improvident prosecutions." *Id.* at ¶ 19.

¶ 13 With these principles in mind, we address the interpretation and application of section 76-6-505(1), which provides in relevant part:

> Any person who issues or passes a check or draft for the payment of money, for the purpose of obtaining from any person, firm, partnership, or corporation, any money, property, or other thing of value or paying for any services, wages, salary, labor, or rent, knowing it will not be paid by the drawee and payment is refused by the drawee, is guilty of issuing a bad check or draft.

Utah Code Ann. § 76-6-505(1).

### I. *Agreement to Hold the Check*

■ ¶ 14 As an initial matter, we address Wallace's argument that Warner's agreement

to hold the check before cashing it provides a defense to prosecution under section 76–6–505(1). It is undisputed that Wallace and Warner had an agreement that Warner would not negotiate the check until several days after it was delivered. Wallace asserts that this agreement somehow transforms the check into a postdated check or, alternatively, removes it from the definition of a check. *See id.* § 70A–3–104(6) (2001) (defining "check"); *Howells, Inc. v. Nelson,* 565 P.2d 1147, 1149–50 (Utah 1977). We reject these contentions for the following reasons.

¶ 15 First, the check that Wallace gave to Warner was not postdated, but instead pre-dated. The main case cited by Wallace, *State v. Bruce,* 1 Utah 2d 136, 262 P.2d 960 (1953), deals with checks that are indeed postdated. *See id.* at 961. Despite any agreement Wallace and Warner may have had to the contrary, the check was at least of current date when Wallace delivered it to Warner and, as a result, the check was immediately negotiable. *See* Utah Code Ann. § 70A–3–106(1) (2001) (providing that an order is unconditional unless it contains an express condition to payment); *id.* § 70A–3–103(1)(f) (2001) (" 'Order' means a written instruction to pay money signed by the person giving the instruction."); *Calfo v. D.C. Stewart Co.,* 717 P.2d 697, 700 (Utah 1986) ("[A]n instrument's negotiability must be determinable from what appears on its face and without reference to extrinsic facts.").

¶ 16 Further, the Utah Supreme Court has rejected a defense to section 76–6–505 premised on the defendant's statement to the victim that the check could not be immediately honored. In *State v. Smith,* 571 P.2d 578 (Utah 1977), the defendant exchanged a check for the deed to certain real property. *See id.* at 579. At the time the check was delivered, the defendant told the seller of the property that there were currently insufficient funds in the account to cover it, but that he would immediately transfer money into the account. *See id.* After he was convicted of passing a bad check, the defen-

dant appealed, claiming that the trial court erred by refusing to instruct the jury that "it is a defense if the maker informs the payee that there are insufficient funds to cover the check." [4] *Id.* The Utah Supreme Court disagreed and affirmed the conviction. *See id.* Although the defendant did not argue that he had not passed a "check," nothing in the *Smith* court's analysis suggests that the defendant's instruction that the check be held until the funds could be transferred insulated the defendant from prosecution under section 76–6–505(1).

¶ 17 Interestingly, *Smith* was decided the same year as the *Howells* decision relied on by Wallace.[5] The earlier decision of *Howells* states that

[t]he law is that where the maker and payee are aware that there are not funds presently available to pay a check and it is therefore post-dated, or agreed to be held, it does not come within the definition of a check, which must be payable on demand, but is properly regarded as a promise to pay in the future.

565 P.2d at 1149–50 (citing *Bruce,* 262 P.2d at 962–63). We believe this statement is not controlling here for several reasons.

¶ 18 The *Howells* court's pronouncement was made in a civil fraud action in which the plaintiff sought to hold the defendant personally liable for a check written on a corporate account. *See id.* at 1149. The defendant's truthful representation that the check could not be negotiated when delivered was relevant to the issue of whether he had the necessary intent to defraud. *See id.* In that context, reliance on *Bruce* was logical because the bad check statute interpreted in *Bruce* also contained an element of intent to defraud. *See Bruce,* 262 P.2d at 962. In 1973, however, the bad check statute was amended and the intent to defraud element was eliminated. *Compare* Utah Code Ann. § 76–20–11 (1953), *with id.* § 76–6–505 (2003). Because the *Howells* court was not faced with a criminal prosecution under the bad check statute, it had no reason to consid-

---

**4.** The defendant based his defense on the voluntary termination of a crime statute. *See* Utah Code Ann. § 76–2–307 (1953).

**5.** *Howells, Inc. v. Nelson,* 565 P.2d 1147 (Utah 1977), was decided June 23, 1977, and *State v. Smith,* 571 P.2d 578 (Utah 1977), was decided October 17, 1977.

er the effect of that amendment on an agreement to hold a check.

¶ 19 Furthermore, in 1993, the Utah legislature adopted the current version of section 70A–3–104(6), which defines a check as "a draft . . . payable on demand and drawn on a bank." Utah Code Ann. § 70A–3–104(6).[6] As discussed, the check delivered to Morris Murdock was payable on demand because it was predated and contained no express conditions to payment on its face. See id. § 70A–3–106(1) (providing that an order is unconditional unless it contains an express condition to payment); Calfo, 717 P.2d at 700 ("[A]n instrument's negotiability must be determinable from what appears on its face and without reference to extrinsic facts.").

¶ 20 For these reasons, we conclude that Wallace's and the magistrate's continuing reliance on Howells is misplaced and the instrument delivered to Morris Murdock was a check or draft actionable under the bad check statute. See Utah Code Ann. § 76–6–505(1) (imposing criminal penalties on any person who passes a bad "check or draft").

II. *Proof that Wallace Acted Knowingly*

¶ 21 We now address the State's challenges on appeal. The State argues that the magistrate incorrectly interpreted section 76–6–505(1) by requiring the State to establish that Wallace acted with a different mental state than the one set forth in that statute. See id. § 76–6–505(1). More specifically, the State contends that the magistrate erred by requiring it to establish that Wallace was "engaging in fraud by misrepresenting the statement of expecting a substantial sum of money," because that effectively required the State to establish that Wallace was acting with an intent to defraud. The State maintains that, instead, the magistrate should have required it to establish only that Wallace acted "knowing[ly]." Id.; see id. § 76–2–103(2) (2003) ("A person engages in conduct . . . [k]nowingly, or with knowledge, with respect to his conduct or to circumstances surrounding his conduct when he is aware of the nature of his conduct or the

existing circumstances. A person acts knowingly, or with knowledge, with respect to a result of his conduct when he is aware that his conduct is reasonably certain to cause the result."). The State also asserts that it should have been able to use circumstantial evidence to establish that Wallace acted "knowing[ly]" and to contradict Wallace's statement that she was expecting a large amount of money to cover the check to Morris Murdock. We agree.

¶ 22 First, there is no longer an element of intent to defraud in section 76–6–505(1). Prior to 1973, the bad check statute required that the defendant act "wilfully, with intent to defraud." Id. § 76–20–11 (1953) (repealed 1973). In 1973, section 76–20–11 was repealed and replaced with section 76–6–505, which, in terms of intent, requires simply that the defendant pass a check "knowing it will not be paid by the drawee." See id. § 76–6–505. Since that amendment, the Utah Supreme Court has held that the "omission of the element [of intent to defraud] in the revised statute logically can mean nothing but that the legislature's purpose deliberately was to remove such intent as an element of the offense." State v. Delmotte, 665 P.2d 1314, 1315 (Utah 1983) (per curiam). Therefore, we conclude that the State had no obligation under section 76–6–505(1) to establish that Wallace acted with an intent to defraud.

¶ 23 Second, we agree that the State should have been able to use circumstantial evidence to establish that Wallace acted "knowing[ly]," Utah Code Ann. § 76–6–505(1), and to contradict Wallace's statement concerning her expectation of a large sum of money to cover the check to Morris Murdock. The Utah Supreme Court "ha[s] held that intent to commit a crime may be inferred from the actions of the defendant or from surrounding circumstances." State v. Colwell, 2000 UT 8, ¶ 43, 994 P.2d 177 (quotations and citations omitted); see also State v. McClain, 706 P.2d 603, 605 (Utah 1985) ("Intent to commit [a crime] may be found from

---

6. A draft is "an order" and an order is "a written instruction to pay money signed by the person giving the instruction." Utah Code Ann. §§ 70A–3–103(f), –104(5) (2001). There is no definition of check or draft in the portion of the Utah Code that contains the bad check statute.

proof of facts from which it reasonably could be believed that such was the defendant's intent." (alteration in original) (quotations and citation omitted)); *cf. State v. Brooks,* 631 P.2d 878, 881 (Utah 1981) ("Since the intent to commit a theft is a state of mind, which is rarely susceptible of direct proof, it can be inferred from conduct and attendant circumstances in the light of human behavior and experience.").

¶ 24 In his memorandum decision, the magistrate disapproved of the State's use of circumstantial evidence to establish Wallace's mental state under section 76–6–505(1). The magistrate noted that the State was attempting to show Wallace's mental state "by showing [Wallace] wrote the checks with the knowledge that there would be insufficient funds based upon the Wallaces' history of debt." The magistrate went on to conclude, however, that the State failed to establish that Wallace acted with the requisite mental state because "there was ample testimony at the preliminary hearing that the [Wallaces] were expecting to receive a substantial amount of money from an investment[,] and there was *no evidence* presented by the State contrary to this representation."[7] (Emphasis added.)

¶ 25 It appears that in his references to the fact that the State presented "no evidence" concerning Wallace's statement to Warner, the magistrate was referring exclusively to direct evidence, not circumstantial evidence. As indicated earlier, the State presented, among other evidence, the testimony of multiple witnesses whose testimony supported an inference that Wallace's statement to Warner was false. Ambrose testified that the Wallaces had written two additional checks to a subsidiary of Morris Murdock at about the same time as the check at issue, both of which were returned for insufficient funds. O'Bryant testified that, under circumstances similar to those experienced by Warner and Morris Murdock, the Wallaces owed numerous individuals in excess of $450,000, and that the Wallaces had written a total of 254 checks that were returned for insufficient funds on nu-

merous bank accounts over approximately a two-year period.

¶ 26 Martinez testified that he had experiences with the Wallaces similar to those of Warner and Morris Murdock. Martinez indicated that the Wallaces had written him checks, but asked him not to negotiate those checks until the following "Tuesday or Wednesday" because the Wallaces were expecting to receive a large sum of money. When Martinez waited until the agreed-upon date to negotiate the checks, they were returned for insufficient funds. Finally, Jeanne Stonely testified that when she contacted the Wallaces about short or missed mortgage payments, they "always convinced [her] that . . . [the money] would be coming."

¶ 27 The State should have been allowed to use circumstantial evidence to support a reasonable inference that Wallace possessed the requisite mental state. *See McClain,* 706 P.2d at 604–06 (finding evidence of nine checks written by defendant on different accounts and returned for insufficient funds relevant as circumstantial evidence of defendant's knowledge that check at issue would not be honored). Therefore, we *cannot* agree with the magistrate's conclusion that "there was *no evidence* presented by the State contrary to" Wallace's representation to Warner. (Emphasis added.) When faced with Wallace's self-serving statement that she was, in good faith, expecting a large sum of money to cover the Morris Murdock check, the prosecution was left with little choice but to use circumstantial evidence to establish Wallace's state of mind. *See, e.g., McClain,* 706 P.2d at 605; *Brooks,* 631 P.2d at 881.

¶ 28 Further, under the standard for binding a defendant over for trial, *see State v. Clark,* 2001 UT 9, ¶¶ 10–16, 20 P.3d 300, any conflicting evidence concerning Wallace's mental state was not to be weighed by the magistrate. *See id.* at ¶ 10 ("[W]hen faced with conflicting evidence, the magistrate may not sift or weigh the evidence . . . but must leave those tasks to the fact finder at trial." (omission in original) (quotations and citations omitted)); *see also State v. Virgin,* 2006

---

7. The State argues and the record supports that the only evidence of the expectation of a substan-
tial amount of cash came from the Wallaces themselves.

UT 29, ¶ 24 ("It is inappropriate for a magistrate to weigh credible but conflicting evidence at a preliminary hearing as a preliminary hearing is not a trial on the merits but a gateway to the finder of fact." (quotations and citation omitted)). Instead, the magistrate was required to view that evidence "in the light most favorable to the prosecution" and was required to "draw all reasonable inferences in favor of the prosecution." *Clark*, 2001 UT 9 at ¶ 10, 20 P.3d 300 (quotations and citations omitted); *see also Virgin*, 2006 UT 29 at ¶ 24. When we view all of the evidence concerning Wallace's mental state—including the circumstantial evidence presented by the State—in this fashion, we conclude that the State presented "sufficient evidence to support a reasonable belief," *Clark*, 2001 UT 9 at ¶ 16, 20 P.3d 300, that Wallace either gave the check to Warner "knowing it [would] not be paid by the drawee," Utah Code Ann. § 76–6–505(1), or was "reasonably certain," *id.* § 76–2–103(2), that the check "[would] not be paid by the drawee," *id.* § 76–6–505(1). Therefore, we conclude that the magistrate erred by failing to bind Wallace over for trial on the charge of issuing a bad check or draft to Morris Murdock.

## CONCLUSION

¶ 29 We conclude that the magistrate incorrectly interpreted and applied section 76–6–505(1) and, as a result, erred by failing to bind Wallace over on the charge of issuing a bad check or draft to Morris Murdock. Therefore, we reverse the magistrate's dismissal of this charge and remand for further proceedings consistent with this opinion.

¶ 30 WE CONCUR: GREGORY K. ORME and WILLIAM A. THORNE JR., Judges.