2001 UT 51

**STATE of Utah, Plaintiff and Appellant,**

**v.**

**Iehab Jamil HAWATMEH, Jamil A. Hawatmeh, Wedad J. Hawatmeh, and Shaher J. Hawatmeh, Defendants and Appellees.**

No. 20000366.

Supreme Court of Utah.

June 22, 2001.

---

Mark L. Shurtleff, Att'y Gen., J. Frederic Voros, Jr., Asst. Att'y Gen., Rodwicke Ybarra, Salt Lake City, for plaintiff.

Earl Xaiz, Lynn C. Donaldson, Edward K. Brass, Salt Lake City, and Walter F. Bugden, Murray, for defendants.

DURHAM, Justice:

¶ 1 On October 19, 1999, the State of Utah charged defendants Iehab Jamil Hawatmeh, Jamil A. Hawatmeh, Wedad J. Hawatmeh, and Shaher J. Hawatmeh with (1) aggravated kidnaping, a first-degree felony, in violation of section 76–5–302 of the Utah Code, and (2) assault, a class A misdemeanor, in violation of section 76–5–102 of the Utah Code, or in the alternative, aggravated assault, a third degree felony, in violation of section 76–5–103 of the Utah Code.

¶ 2 At the preliminary hearing, the magistrate bound defendants over on aggravated assault and kidnaping, but refused to bind over on the charge of aggravated kidnaping. We granted the State's petition for interlocutory appeal from the magistrate's ruling refusing to bind over on aggravated kidnaping charges. We reverse.

## BACKGROUND

¶ 3 At the preliminary hearing stage, "the magistrate's role in evaluating th[e] evidence is limited.... '[T]he magistrate should view the evidence in a light most favorable to the prosecution and resolve all inferences in favor of the prosecution.'" *State v. Talbot,* 972 P.2d 435, 438 (Utah 1998) (quoting *State*

*v. Pledger,* 896 P.2d 1226, 1229 (Utah 1995)). We recite the facts accordingly.

¶ 4 Muna Hawatmeh, a 23–year–old woman, was born in the Kingdom of Jordan and came to the United States in or about 1995. Muna resided with her family in Sandy, Utah, until December 1998, when she moved out of the family residence and began residing with a woman named Leticia Rivera, with whom she had developed a romantic relationship. During the next several months, Muna and her family were involved in turmoil and unrest concerning Muna's sexual orientation and her romantic involvement with Leticia. Muna's family made numerous phone calls to her, urging her to return home and stop being a lesbian. Muna's brother, defendant Shaher, left messages on Leticia's answering machine saying, "lesbians must die."

¶ 5 The crimes at issue were allegedly committed over the course of two days in October 1999. On the evening of October 13, Muna went to the Hawatmeh family residence, intending to spend the night. When Muna arrived, defendants were waiting for her. Her brother, defendant Iehab, slapped her hard on her face, and Muna fell to the floor. Muna's mother, defendant Wedad, and her two brothers then locked the door, closed the windows, and turned up the volume on the television. They proceeded to hit Muna, pull her hair, and kick her all over her body as she lay screaming on the floor.

¶ 6 At some point, Wedad stopped participating in Muna's beating. Muna's brothers, however, beat Muna continuously for about four hours as her mother and father sat on a couch and watched. During the beating, Shaher called Muna "bitch" and "whore" and made her say, "I'm a bitch and I deserve to be killed." He held up a large knife and told Muna he was going to kill her and "make [her] ugly" with the knife. He threatened that she was "going to die tonight" and "going to go to hell tonight." Iehab made similar threats, calling Muna a "bitch," telling her she did not "deserve to live," and saying, "you [are] going to die tonight. We [are] going to kill you." They also told Muna they were going to "put [her] in a bag" in the trunk of the car and "throw [her] somewhere which [sic] is nobody going to find you."

¶ 7 At one point during the ordeal, Iehab held Muna's arms and told her father, defendant Jamil, to hit her and beat her. According to Muna, her father "was just looking at [her], and [she] was looking at his eyes, don't do it, don't." He hit her anyway. Muna kissed her father's feet and begged for her life, saying she would change and would not be a lesbian any more. Eventually, Muna implored her father to take her back to Jordan where she would be a different person. After repeated pleas, Jamil finally agreed to take her back to Jordan.

¶ 8 After the beating, Muna's face, neck, arms, legs, and back were bruised, her stomach and shoulders hurt "really bad," and she could barely walk. Muna's mother helped her to the bedroom and told her that if she had just changed from the beginning, they would not have had to beat her.

¶ 9 The next morning, October 14, Iehab woke up Muna and told her to get ready to leave for Jordan. Defendants had Muna's passport and green card in their possession. Iehab took Muna downstairs and dictated a letter in which Muna told Leticia that she was no longer a lesbian. The Hawatmehs packed their bags and headed for the airport.

¶ 10 A short distance from home, the family encountered Leticia who had been driving in her car looking for Muna. Iehab stopped the family car and had a verbal confrontation with Leticia. Iehab told Letitia that Muna didn't want to see her anymore and told her "if you want to live, get the f* * * out of here, you whore." Iehab got out of the car and tried to grab Leticia, but Leticia drove away and went to the Sandy City police station where she reported Muna as a missing person.

¶ 11 While the family was on the way to the airport, a Sandy police officer called Iehab's cell phone. Iehab directed Muna to tell the police officer that she was spending time with her family. The officer requested that Iehab bring Muna to the Sandy police station so the police could make sure Muna was all right. Iehab finally agreed and then told Muna, "you're not going to tell them the truth[,] right?" He instructed Muna to tell the police that the bruises on her face and neck were hickeys. Shaher threatened

Muna, saying, "the knife is going to be in your stomach if you tell the truth." Defendants then took Muna to the police station. While being questioned by the police, Muna "tried to lie because [she] was scared, afraid of [defendants]." She could "not hold it," however, and told the police what had happened.

¶ 12 At the preliminary hearing, Muna testified about the foregoing events of October 13 and 14. The State asserts that the evidence presented against defendants was sufficient to support the charge of aggravated kidnaping.

## STANDARD OF REVIEW

¶ 13 "The determination of whether to bind a criminal defendant over for trial [on a particular charge] is a question of law." *State v. Clark,* 2001 UT 9, ¶ 8, 20 P.3d 300 (citing *State v. Humphrey,* 823 P.2d 464, 466 (Utah 1991)). "Accordingly, we review that determination without deference to the court below." *Id.* (citing *Humphrey,* 823 P.2d at 465–66).

## DISCUSSION

¶ 14 At a preliminary hearing, "the State must show 'probable cause' ... by 'present[ing] sufficient evidence to establish that "the crime charged has been committed and that the defendant has committed it." ' " *Clark,* 2001 UT 9 at ¶ 10–11, 20 P.3d 300 (clarifying the question of what constitutes sufficient evidence to support a finding of probable cause at a preliminary hearing) (quoting *State v. Pledger,* 896 P.2d 1226, 1229 (Utah 1995) (quoting Utah R.Crim. P. 7(h)(2))). To prevail at this stage, the prosecution must:

> produce believable evidence of all the elements of the crime charged, just as it would have to do to survive a motion for a directed verdict. However, unlike a motion for a directed verdict, this evidence need not be capable of supporting a finding of guilt beyond a reasonable doubt.

> Instead, ... the quantum of evidence necessary to support a bindover is less than

that necessary to survive a directed verdict motion.

*Clark*, 2001 UT 9 at ¶¶ 15–16, 20 P.3d 300 (internal quotations and citations omitted).

■ ¶ 15 Recently, in *State v. Clark*, we specified that at the preliminary hearing stage, the magistrate should apply the same probable cause standard as that applied at the arrest warrant stage.[1] *See id.* at ¶ 16. Under this standard, "the prosecution must present sufficient evidence to support a *reasonable belief* that an offense has been committed and that the defendant committed it." *Id.* (citing *Anderson*, 612 P.2d at 783–84) (emphasis added).

■ ¶ 16 Applying the standard to this case, we must determine whether the State presented sufficient evidence to support a reasonable belief that defendants committed the crime of aggravated kidnaping. Under section 76–5–302 of the Utah Code, "A person commits aggravated kidnaping if the person intentionally or knowingly, without authority of law and against the will of the victim, by any means and in any manner, seizes, confines, detains, or transports the victim ..." *and* a statutory aggravating factor is present. § 76–5–302(1). Because defendants do not challenge the magistrate's

ruling binding them over for kidnaping,[2] the question on appeal is whether the preliminary hearing evidence supports a reasonable belief that a statutory aggravating factor was present.

¶ 17 The State alleges that based on the evidence of events on October 14, the following three aggravating factors can be inferred: [3]

(1) "in committing, attempting to commit, or in the immediate flight after the attempt or commission of the kidnaping, the actor possesses, uses, or *threatens to use a dangerous weapon* as defined in Section 76–1–601," Utah Code Ann. § 76–5–302(1)(a)(1999) (emphasis added);

(2) "with intent ... to facilitate the commission, attempted commission, or flight after commission or attempted commission of a felony," § 76–5–302(1)(b)(ii); [4] or

(3) "with intent ... to inflict bodily injury on or to terrorize the victim or another," § 76–5–302(1)(b)(iii).

¶ 18 In support of its allegations, the State first argues that Shaher's threat to Muna on October 14, 1999, that "the knife is going to be in your stomach if you tell the truth," evidences a "threat[ ] to use a dangerous weapon" in connection with the kidnaping.

1. As a practical matter, however, we noted that the State has a higher burden at the preliminary hearing stage than at the arrest warrant stage because at the preliminary hearing, the accused has the right to cross-examine the State's witnesses and to present witnesses in his defense. *See Clark*, 2001 UT 9 at ¶ 16 & n. 3, 20 P.3d 300 (citing *State v. Anderson*, 612 P.2d 778, 783 (Utah 1980)).

2. A person commits kidnaping "when he intentionally or knowingly and without authority of law and against the will of the victim: (a) detains or restrains another for any substantial period; or (b) detains or restrains another in circumstances exposing him to risk of serious bodily injury...." Utah Code Ann. § 76–5–301(1) (1999).

3. The district court made its ruling based on the case of *State v. Finlayson*, 2000 UT 10, 994 P.2d 1243, where we held that the defendant's detention of his rape victim before and during the sexual assault did not support a kidnaping conviction because it was "incidental to the assault," and thus, merged into the underlying sexual assault. *Id.* at ¶ 23. *Finlayson* is not applicable to the instant case, however, because we are not

dealing with *convictions* for aggravated kidnaping, but merely aggravated kidnaping charges.

Furthermore, although *Finlayson* may be applicable to the aggravated assault charge based on events on October 13, defendants do not dispute that the simple kidnaping charge is a separate incident, based only upon October 14 events. The State argues that evidence regarding October 14 events is sufficient to support an inference of aggravated kidnaping. Therefore, we treat the events of October 14 as a crime separate from the assault on October 13, and merger is not at issue.

4. Although this aggravating factor was argued to the district court, it was not charged below. However, as the State points out on appeal, the rules permit a court to amend an indictment or information "at any time before verdict if no additional or different offense is charged and the substantial rights of the defendant are not prejudiced." Utah R.Crim. P. 4(d). On remand, the prosecution may be entitled to amend the information to add this omitted aggravating factor. Therefore, in the interest of judicial economy and providing guidance to the parties and the trial court, we consider this aggravating factor.

§ 76–5–302(1)(a). Second, the State contends that based on the evidence of the assault, a trier of fact could reasonably infer that defendants were fleeing to Jordan to avoid the consequences of their prior crime of assault, or alternatively, that defendants were taking Muna to Jordan to complete their threats of killing her, thereby demonstrating the intent "to facilitate the commission, attempted commission, or flight after commission or attempted commission of a felony." § 76–5–302(1)(b)(ii). Third, the State contends that the evidence demonstrating that defendants threatened to disfigure Muna, to kill her, and to kill Leticia, supports the theory that defendants detained her on October 14 with the intent "to inflict bodily injury on or to terrorize the victim or another." § 76–5–302(1)(b)(iii).

¶ 19 In response, defendants claim that the State has mischaracterized the facts from the evidence presented for each of the three alleged aggravating factors. First, defendants contend there was no threat of a dangerous weapon made in connection with the kidnaping. They claim that when Shaher threatened Muna with his statement that "the knife is going to be in your stomach if you tell the truth," the detention of Muna had terminated because defendants had already agreed to take Muna to the police station. Second, defendants argue there was no evidence that defendants were fleeing during the commission of a felony or to escape the consequences of their prior crime. Third, defendants claim that the threats and demands upon Muna on the evening of October 13 cannot demonstrate intent to inflict bodily injury or terrorize in conjunction with the kidnaping on October 14, and that the evidence does not support an inference that defendants intended to inflict further injury on October 14.

¶ 20 In making our determination, we "[v]iew[ ] the evidence, and all reasonable inferences drawn therefrom, in a light most favorable to the prosecution." *State v. Clark*, 2001 UT 9, ¶ 20, 20 P.3d 300. In this light, we hold that the evidence presented by the State was sufficient to meet the reasonable belief standard as to the three aggravating factors alleged. Although defendants' char-acterizations of the facts may also be plausibly inferred from the evidence, there are clearly factual issues that must be resolved at trial, and the facts do not negate the reasonable inferences presented by the State. *See id.* Therefore, we hold that the State has met its burden to support bind-over of defendants on the charge of aggravated kidnaping.

## CONCLUSION

¶ 21 We reverse the magistrate's ruling refusing to bind over defendants on the charge of aggravated kidnaping and remand for further proceedings consistent with this opinion.

¶ 22 Chief Justice HOWE, Associate Chief Justice RUSSON, Justice DURRANT, and Justice WILKINS concur in Justice DURHAM'S opinion.