2011 UT 74

**STATE of Utah, Plaintiff and Appellant,**

v.

**Aaron N. HARRISON, Defendant and Appellee.**

**No. 20090975.**

Supreme Court of Utah.

Dec. 13, 2011.

---

Mark L. Shurtleff, Att'y Gen., Christopher D. Ballard, Asst. Att'y Gen., Salt Lake City, for plaintiff.

Michael L. Humiston, Vernal, for defendant.

Justice LEE, opinion of the Court:

¶ 1 Aaron Harrison was charged with and pleaded guilty to attempted murder of the unborn child of a juvenile mother, J.M.S. The charge and plea were based on the allegation that Harrison tried to kill the child by punching J.M.S. in the abdomen in exchange for a $150 payment by J.M.S. At Harrison's sentencing, the district court sua sponte found him ineligible for conviction of attempted murder under the standard set forth in *State v. Shondel*, 22 Utah 2d 343, 453 P.2d 146, 148 (1969) ("[W]here there is doubt or uncertainty as to which of two punishments is applicable to an offense an accused is entitled to the benefit of the lesser."), and sentenced him instead on the lesser charge of attempted "killing an unborn child" by abortion, UTAH CODE ANN. § 76–7–314.5(1) (Supp.2011).[1] Specifically, the district court concluded that the elements of attempted murder of an unborn child are "wholly duplicative" of the elements of attempted killing of an unborn child by abortion, and thus held that Harrison could be sentenced only to the lesser of the two identical crimes.

¶ 2 The State filed this appeal. At oral argument, the court raised questions about the statutory and constitutional basis for the State's appeal. Harrison subsequently filed a supplemental brief challenging the State's statutory right to appeal and asserting that a

reversal and remand would raise double jeopardy problems.

¶ 3 We uphold the State's right to appeal, reverse the district court's dismissal of the attempted murder charge, and remand for sentencing on that count. The State has a statutory right of appeal from the district court's *Shondel* holding because it implemented that decision to effect a "final judgment of dismissal" of the murder charge, which is appealable under Utah Code section 77–18a–1(3)(a). Our reconsideration of that decision, moreover, does not raise double jeopardy concerns because a reversal would not subject Harrison to successive prosecution but would merely reinstate his guilty plea on the attempted murder charge. Finally, as to the merits of the *Shondel* question, we reverse and remand on grounds set forth in *In re J.M.S.*, 2011 UT 75, —— P.3d ——, 2011 WL 6323022, a parallel proceeding involving charges against the juvenile mother who paid Harrison to commit this crime.

I

¶ 4 J.M.S. and Harrison met for the first time in a chance, nighttime encounter on a dark road in Naples, Utah. J.M.S. had hit the streets after midnight on May 20, 2009. She was young, pregnant, single, and desperate. Her boyfriend had told her that he wanted nothing to do with her as long as she was pregnant, and J.M.S. had been denied an abortion because she was too far along in her pregnancy. When she left home on May 20, she was thinking of hitchhiking her way across the country to Florida. Before she got far she ran into Harrison.

¶ 5 J.M.S. told Harrison about her predicament and eventually offered to pay him $150 if he would help kill her unborn child. Harrison agreed, and the two of them traveled to Harrison's home to try to do so. When they got there, J.M.S. lay down on Harrison's bed and suggested that Harrison repeatedly punch her in the abdomen. Harrison did so after turning out the lights, as J.M.S. had requested. He also slapped her in the face

---

1. Where there have been no substantive changes to the relevant statutes that would affect this

opinion, we cite to the current versions.

and bit her neck, hoping to make the incident look like a random assault.

¶ 6 J.M.S. called her mother and asked her to drive her to the police station. Under questioning by the police, J.M.S. initially insisted that an unknown man had assaulted her. When police investigators challenged some inconsistencies in her story, however, J.M.S. eventually admitted that she had paid Harrison to try to kill her unborn child by punching her.

¶ 7 J.M.S.'s child survived Harrison's assault. Harrison was charged with one count of attempted murder, a second degree felony. He pleaded guilty to that charge. At Harrison's sentencing hearing, the district court sua sponte questioned Harrison's eligibility for conviction of attempted murder. Finding that Harrison's conduct amounted to the third degree felony of attempted killing of a child by abortion, the district court effectively dismissed the second degree felony charge (for attempted murder) and sentenced Harrison on a third degree felony (of attempted killing of an unborn child by abortion). The district court found this result mandated by this court's decision in *Shondel* and ultimately sentenced Harrison to zero to five years in prison.

## II

■ ¶ 8 The threshold question in this case is whether the State has a right to appeal. "There is no inherent right to appellate review. Such a right must be positively recognized by statute or a constitutional provision." *State v. Clark*, 2011 UT 23, ¶ 6, 251 P.3d 829. In criminal cases, the prosecution's statutory right to appeal is limited and shaped by the constitutional guarantee against double jeopardy. In light of this important right, some decisions adverse to the prosecution are unappealable because a remand for further proceedings would subject a defendant to successive prosecution.

■ ¶ 9 To protect against the infringement of that right, the prosecution has a statutory right to appeal only from specifically enumerated judgments or orders.[2] Appealable decisions in Utah include "a final judgment of dismissal." UTAH CODE ANN. § 77–18a–1(3)(a) (2008). The judgment on appeal in this case resulted from an effective dismissal of the attempted murder charge on *Shondel* grounds. We have previously deemed such applications of the *Shondel* doctrine appealable on that basis. In *State v. Gomez*, 722 P.2d 747 (Utah 1986), we upheld the State's right to appeal where the "effect of the trial court's ruling was to block prosecution" of a more serious offense under *Shondel*. *Id.* at 749. Because such a decision "in effect ... dismiss[es] the original charges," *Gomez* regarded *Shondel* decisions as appealable judgments of dismissal. *Id.*[3]

---

**2.** It is worth noting that the statutory right of appeal in Utah exists in the shadow of article VIII, section 5 of the Utah Constitution, which provides that "there shall be in all cases an appeal of right from the court of original jurisdiction to a court with appellate jurisdiction over the cause." The parties have not briefed the effect, if any, of this provision on the State's right to appeal, and we accordingly do not reach it.

**3.** The contrary precedent cited in Chief Justice Durham's dissent, *infra* ¶¶ 25–27, is inapposite because it arose under an earlier version of the appeal statute that is more restrictive than the current one. As the dissent indicates, the court in *State v. Davenport* dismissed an appeal from a judgment granting defendant's motion to dismiss on speedy trial grounds because such an appeal was a "stranger to the only four [statutory] bases upon which the State may appeal." *Infra* ¶ 25 (quoting *Davenport*, 30 Utah 2d 298, 517 P.2d 544, 545 (1973)). That holding was correct under the then-prevailing version of the appeal statute, but it has since been overtaken by a statutory

amendment broadening the State's right to appeal.

When Davenport was decided, the State's right to appeal from judgments of dismissal was limited to a particular type of dismissal specified in the statute—one "in favor of the defendant *upon a motion to quash the information or indictment.*" UTAH CODE ANN. § 77–39–4(1) (1953) (emphasis added). Under that provision, *Davenport* correctly held that a dismissal on speedy trial grounds fell outside the appeal statute. And if that earlier version of the statute were still in place, the dissent would be right to insist that the State's appeal right is dictated by the form of the dismissal and not its effect. But the appellate standard changed in 1980, when the legislature recognized the State's right to appeal not just a dismissal "upon a motion to quash the information or indictment," UTAH CODE ANN § 77–39–4(1) (1953), but any "final judgment of dismissal," *id.* § 77–18a–1(3)(a) (2008). *See* 1980 Utah Laws 106.

Under this now-controlling language, *Gomez* rightly grounded the State's right to appeal on

¶ 10 We reaffirm and apply that precedent here. When the district court declined to sentence Harrison on the attempted murder count to which he pleaded guilty, it "block[ed] prosecution" of that offense and "in effect" dismissed the attempted murder charge. *Id.* That decision was appealable as a "final judgment of dismissal" under *Gomez.*

¶ 11 We acknowledge that the district court's *Shondel* decision here lacked an element of formality that was present in *Gomez.* In that case the district court coupled its *Shondel* conclusion with the "suggest[ion] that the information be amended to charge the lesser offense," while the State "took the position that the proper remedy would be a dismissal by the trial court." *Id.* at 748. The district court responded by formally dismissing the information, and the State "appeal[ed] from the dismissal." *Id.* at 748–749.

¶ 12 But although the district court's decision in *Gomez* resulted in a formal dismissal, it was not that formality that rendered the decision an appealable "judgment of dismissal." Our analysis in *Gomez,* rather, turned on the substance and effect of the district court's application of *Shondel.* We found that decision appealable on the ground that the *"effect* of the trial court's ruling was to block prosecution" of a more serious offense under *Shondel,* emphasizing that such a decision "in effect ... dismiss[ed] the original charges." *Id.* at 748 (emphasis added). The emphasis on substance over form in this circumstance is appropriate. A contrary view would create perverse incentives and establish an arbitrary standard of appeal ability that we cannot reasonably attribute to the legislature.

¶ 13 It would certainly have been better for the district court to have followed the practice of the trial court in *Gomez*—to have suggested that the State amend its information to reduce the second degree felony charge (for attempted murder) to a third degree felony charge (for attempted killing of an unborn child by abortion). And if the State had rejected such a request, it would likewise have been appropriate for the court

to have formally dismissed the attempted murder charge, leaving the State with an unquestioned right to appeal from the dismissal of the greater offense and the freedom to file an amended information on the lesser one.

¶ 14 But the question before us is not whether the decision below might have been more clearly appealable under ideal circumstances that we can now hypothesize. It is instead whether the district court foreclosed the State's right to appeal when it bypassed the proper procedure under *Shondel* by proceeding straight to sentencing on a lesser count not yet charged by the State but anticipated by the court. That question is readily answerable in the negative, both under the *Gomez* precedent and in light of the perverse incentives that a contrary decision would generate.

¶ 15 The *Gomez* court's focus on the substance and effect of a *Shondel* decision is eminently sensible. If we required formal dismissal as a precondition to appellate review of *Shondel* decisions, district courts would have unreviewable authority to block or effectively dismiss criminal charges so long as they avoided the formality of entering a judgment of dismissal. That makes little practical sense. The legislature could not have meant to allow a district court to avoid appellate review by eschewing dismissal and opting instead to substitute a new criminal charge in place of the one chosen by the prosecution. Such a decision lacks any basis in the law, as the court in an adversary system is required to adjudicate the charges or claims before it, not others that it might deem preferable. A decision to ignore that limitation cannot possibly put the district court in a more favorable position with respect to appellate review. Thus, we reaffirm our analysis in *Gomez* and hold that a *Shondel* decision is appealable because it has the effect of dismissing a criminal charge, whether or not it culminates in the entry of a formal judgment of dismissal.

the practical effect of a district court's ruling. Thus, our decision today does not revive the *Davenport* dissent, as Chief Justice Durham suggests. It simply credits a statutory amendment as interpreted by more recent authority.

¶ 16 We likewise reject Harrison's double jeopardy challenge to our review of this case on appeal. The Double Jeopardy Clause generally protects against "threat[s] of either multiple punishment or successive prosecutions." *United States v. Wilson,* 420 U.S. 332, 344, 95 S.Ct. 1013, 43 L.Ed.2d 232 (1975). If a defendant benefits from an error of law at trial that can be "corrected without subjecting him to a second trial before a second trier of fact," that error can be corrected without implicating double jeopardy. *Id.* at 345, 95 S.Ct. 1013. Thus, where "reversal on appeal would merely reinstate the jury's verdict, review of such an order does not offend the policy against multiple prosecution[s]." *Id.* at 344–45, 95 S.Ct. 1013.

¶ 17 Harrison's double jeopardy argument fails under these standards. If the district court erred in its *Shondel* analysis, it did so in a way that can be corrected without subjecting him to successive prosecution. Any error by the district court in this case can be corrected by merely reinstating Harrison's guilty plea to the charge of attempted murder. Our review on appeal thus steers clear of any double jeopardy concerns, and we accordingly proceed to the merits of the State's appeal.

## III

¶ 18 The district court's *Shondel* holding rested on the conclusion that any method of killing an unborn child would constitute an "abortion" and thus be encompassed in Utah Code section 76–7–301. Because the statute defines "abortion" to encompass any "procedure[ ] undertaken to kill a live unborn child," UTAH CODE ANN. § 76–7–301(1) (2008),[4] the court found the elements of criminal homicide of an unborn child and killing an unborn child by abortion to be "wholly duplicative." And because the latter is a lesser offense, the district court deemed Harrison ineligible for sentencing on the crime of attempted murder under the standards set forth in our decision in *Shondel.*

¶ 19 We reverse. For reasons explained in detail in our opinion in the companion case against J.M.S., there is no *Shondel* bar to Harrison's sentencing on the charge of attempted murder because the elements of attempted murder differ from the elements of attempted killing of an unborn child by abortion. *In re J.M.S.,* 2011 UT 75, ¶¶ 22–26, ——— P.3d ———. In fact, the two offenses are mutually exclusive, as the murder statute expressly provides that there is "no cause of action for criminal homicide for the death of an unborn child caused by an abortion," UTAH CODE ANN. § 76–5–201(1)(b) (2008), while the statute prohibiting killing an unborn child applies only where the defendant causes death "by performing an abortion of the unborn child," *id.* § 76–7–314.5(1) (Supp. 2009).

¶ 20 The district court's *Shondel* analysis improperly erases the lines drawn by the legislature between these two offenses. Under the governing statutory scheme, a defendant who causes the death of an unborn child by means other than an abortion is guilty of criminal homicide, while a defendant who kills such a child by performing an abortion is guilty of a lesser offense. Yet the district court embraced a definition of "abortion" that eliminates this distinction. In holding that a violent assault like Harrison's is a "procedure[ ] undertaken to kill a live unborn child" and thus an "abortion" under Utah Code section 76–7–301(1), the district court effectively deemed all acts aimed at killing an unborn child as exempt from the criminal homicide statute. If Harrison's blows to J.M.S.'s abdomen constitute an abortion procedure, then so would a gun shot or a knife slash. Such assaults cannot possibly be exempt from the criminal homicide statute without eviscerating express language in the statute clarifying that it extends to the killing of "an unborn child at any stage of its development." *Id.* § 76–5–201(1). Thus, to preserve independent meaning for the criminal homicide statute, the killing of an unborn child statute must be limited to the causing of death by a medical procedure. Nonmedical acts aimed at causing death, by contrast,

---

4. The legislature amended certain provisions regarding abortion in 2009, and these amendments took effect eight days before the alleged assault of J.M.S. *See* 2009 Utah Laws 38. We cite to the provisions of law in effect at the time of the alleged assault.

are the domain of the criminal homicide statute.

¶ 21 Under this analysis, the district court erred in its application of *Shondel.* Harrison's blows to J.M.S.'s abdomen were hardly a medical procedure that could be denominated an "abortion." When Harrison assaulted J.M.S. he attempted to kill her unborn child in a manner other than by a medical procedure, and he accordingly was properly charged with and pled guilty to attempted murder.

## IV

¶ 22 We reverse the district court's effective dismissal of the attempted murder charge against Harrison, vacate the sentence it entered on the lesser charge of attempt to kill an unborn child by an abortion, and remand for further proceedings consistent with this opinion.

Justice LEE authored the opinion of the court, in which Associate Chief Justice DURRANT and Justice PARRISH joined.

Chief Justice DURHAM filed a dissenting opinion, in which Justice NEHRING joined.

Chief Justice DURHAM, dissenting:

¶ 23 I respectfully dissent. The majority asserts that the State has a right of appeal because the district court "in effect" dismissed the attempted murder charge against Mr. Harrison. In my view, the district court's conviction and sentencing of Mr. Harrison on a lesser charge is not a ruling from which the State may appeal. We therefore lack jurisdiction to hear this appeal.

¶ 24 "The circumstances under which the State may appeal adverse rulings in the [district] court in criminal cases have traditionally been limited by constitutional and statutory provisions." *State v. Waddoups,* 712 P.2d 223, 224 (Utah 1985). Utah Code section 77–18a–1(3) "delineates a narrow category of cases" from which the State may appeal as a matter of right. *Id.* If the State's claimed right of appeal does not fall expressly within the eleven enumerated bases provided by statute, the State's case is at an end. *See State v. Kelbach,* 569 P.2d 1100, 1102 (Utah 1977) ("[T]he state has no right to appeal except as *expressly provided* . . . [by] statute." (emphasis added)).

¶ 25 We have long recognized that the statute granting the State's rights to appeal in criminal cases is restrictive rather than permissive. For example, in *State v. Davenport,* this court held that the State had no standing to appeal a dismissal on the ground that the defendant had been denied a speedy trial because such an appeal was a "stranger to the only four [statutory] bases upon which the State may appeal." 30 Utah 2d 298, 517 P.2d 544, 545 (1973). Justice Crockett vigorously dissented, arguing that the appeal statute was "permissive" and that "the *essential effect*" of the dismissal was "a quashing of the entire proceeding, . . . includ[ing] the quashing of the information," which was a statutory basis for appeal. *Id.* at 546 (Crockett, J., dissenting) (emphasis added). He also asserted that denying the State the right of appeal would insulate a trial judge's "whim or caprice" and allow a judge to "dismiss a case however important or serious" without a remedy for the State. *Id.*

¶ 26 Justice Crockett's dissent in *Davenport* was not, and has never been, controlling law. Four years later, in *State v. Kelbach,* he recognized that, despite his effort in *Davenport* to persuade the court to more liberally construe the appeal statute, it had rejected his reasoning and had ruled to the contrary. 569 P.2d at 1102. Justice Crockett wrote for the *Kelbach* majority, which denied the State's assertion that it had a right to appeal a sentence because a sentence was "an order made after judgment." *Id.* at 1101–02. The court held that the State has "no right to appeal except as *expressly provided* . . . [by] statute" and that an appeal of a sentence was not an express basis for appeal. *Id.* at 1102 (emphasis added). Noting that its ruling left the State without a remedy, the court stated that "[a]s a general proposition the law as established should remain so until changed by the legislature, whose prerogative it is to make and to change the law." *Id.*

¶ 27 I see no essential difference between the majority's analysis today and Justice Crockett's unsuccessful dissent in *Davenport.* According to each, it does not matter wheth-

er the lower court's ruling falls expressly within the State's enumerated rights of appeal so long as the court's action "in effect" resembles one of the enumerated rights. This is not a principled way to determine when the State has a right of appeal, and it transforms the appeal statute into a permissive, rather than restrictive, legislative grant. Rather than loosely construing a court's *Shondel* ruling as "effectively" constituting a final judgment of dismissal, we should reject the State's appeal and allow the legislature, "whose prerogative it is to make and to change the law," to determine whether it is appropriate to grant the State an express right of appeal in such cases. *Id.; see also State v. Allesi,* 211 N.W.2d 733, 735 (N.D. 1973) (Tiegen, J., dissenting) ("Under the majority holding the State's rights of appeal in criminal cases have been broadened far beyond the limited rights provided by statute. The holding, in my opinion, amounts to judicial legislation.").

¶ 28 Nor do I view our ruling in *State v. Gomez,* 722 P.2d 747 (Utah 1986), as supporting the majority's conclusion. It is true that we stated in *Gomez* that "[t]he effect of the trial court's [*Shondel*] ruling was to block prosecution and, in effect, to dismiss the original charges." *Id.* at 749. But beyond that threshold was the fact that the lower court's procedural action in *Gomez* provided the State with a specific statutory right of appeal. We noted that "the State *properly suggested* that the trial court *formally dismiss* the information and then appealed '[f]rom a final judgment of dismissal.'" *Id.* (alteration in original) (emphases added). The court's discussion of the effect of the *Shondel* ruling was therefore dicta in light of the opinion's reliance on the district court's actual, formal dismissal of the State's charge. *Gomez* merely confirms that the State must take proper formal action to preserve its right of appeal.

¶ 29 I also do not share the majority's unease with elevating form over substance where the State's right of appeal is involved. The legislative approach has been carefully tailored to govern a delicate area of constitutional criminal procedure. Much like Justice Crockett's rejected concern that trial judges may make whimsical, arbitrary decisions that are not reviewable, the majority expresses alarm that denying the State's ability to appeal could result in district courts insulating their rulings by "avoid[ing] the formality of entering a judgment of dismissal." *Supra* ¶ 15. First, I do not foresee an outbreak of *Shondel* rulings from trial judges intent on making their rulings unreviewable. *Compare supra* ¶ 15 (expressing fear that trial judges might adjudicate charges they "deem preferable"), *with Davenport,* 517 P.2d at 546 (Crockett, J., dissenting) (expressing concern that trial judges will dismiss cases on arbitrary bases). Moreover, were such an outbreak to occur, the State would have other avenues to address its lack of a right of appeal. One would be through seeking an express statutory right of appeal from the legislature.[1] Another would be to request a formal dismissal from the district court and, if that request is denied, to petition for extraordinary relief from this court pursuant to rule 65B of the Utah Rules of Civil Procedure. *Cf. State v. Laycock,* 2009 UT 53, ¶ 7, 214 P.3d 104; *State v. Barrett,* 2005 UT 88, ¶ 6, 127 P.3d 682.

¶ 30 The State's right of appeal is a deliberately circumscribed one, limited expressly by statute. This narrow application of the appeal statute may at times leave the State without a remedy as of right in the face of an adverse ruling. But I do not think it proper for this court to expand appellate rights based on our perception that certain rulings are "in effect" equivalent to enumerated rights of appeal in the statute. The district court's entry of a conviction and sentence for Mr. Harrison provides no basis for an appeal by the State, and I therefore conclude this

---

1. Indeed, it is not uncommon for the legislature to provide a statutory basis of appeal after the State finds itself without a remedy in the appeal statute. *See State v. Barrett,* 2005 UT 88, ¶ 6 n. 3, 127 P.3d 682 (noting the legislature's amendment to the appeal statute "allow[ing] the State to directly appeal a district court's reduction in the degree of the charged offense"); *cf. State v. Henriod,* 2006 UT 11, ¶ 6 n. 2, 131 P.3d 232 (stating that the legislature's amendment to the appeal statute took effect two months after the district court's interlocutory order and therefore did not apply).

court has no jurisdiction to entertain the State's appeal.