2015 UT App 22

# THE UTAH COURT OF APPEALS

STATE OF UTAH,
Plaintiff and Appellant,
*v.*
RICHARD ARGHITTU,
Defendant and Appellee.

Opinion
No. 20130677-CA
Filed January 29, 2015

Third District Court, Salt Lake Department
The Honorable William W. Barrett
The Honorable Elizabeth A. Hruby-Mills
The Honorable Robin W. Reese
No. 121900103

Sean D. Reyes and Jeffrey S. Gray, Attorneys
for Appellant

Richard P. Mauro, Attorney for Appellee

JUDGE JOHN A. PEARCE authored this Opinion, in which JUDGES
GREGORY K. ORME and STEPHEN L. ROTH concurred.

PEARCE, Judge:

¶1     The State charged Richard Arghittu with distribution of a
controlled substance analog, money laundering, and participating
in a pattern of unlawful activity. The charges stemmed from his
alleged distribution of a form of synthetic marijuana known as
AM-2201. After Arghittu's preliminary hearing, a district court
judge, acting as a magistrate, concluded that AM-2201 was not an
analog of the controlled substance JWH-018 as the State had
alleged. The magistrate found probable cause to bind Arghittu over
on one lesser, but uncharged, count of drug possession not

involving AM-2201. The State declined to amend the information to charge the single lesser count, and the magistrate dismissed the information at the State's request.[1] The State appeals from the order of dismissal. We reverse and remand for further proceedings.

BACKGROUND[2]

¶2      Arghittu, acting through two businesses that he owned or co-owned, packaged and distributed synthetic marijuana, commonly known as "spice." As of mid-2010, the psychoactive ingredient in Arghittu's products was the synthetic cannabinoid JWH-018. Arghittu would purchase the spice in bulk, package it in small plastic jars or ziplock foil bags, and ship it to smoke shops, gas stations, and novelty stores across the country. At that time, JWH-018 was not listed as a controlled substance under Utah or federal law.

¶3      In November 2010, the United States Drug Enforcement Agency (the DEA) issued a notice of intent to temporarily categorize JWH-018 and several other synthetic cannabinoids as Schedule I controlled substances. In March 2011, the federal listing of JWH-018 as a controlled substance was finalized. Also in 2011, the Utah Legislature amended the Utah Code to expressly identify

---

1. Judge Barrett conducted the preliminary hearing and ruled orally that Arghittu could be bound over solely on the single lesser count. Judge Hruby-Mills signed the findings of facts and conclusions of law that implemented that ruling. Judge Reese entered the order dismissing the information.

2. "At a preliminary hearing, '[t]he magistrate should view the evidence in a light most favorable to the prosecution and resolve all inferences in favor of the prosecution.'" *State v. Graham*, 2013 UT App 109, ¶ 2 n.1, 302 P.3d 824 (alteration in original) (quoting *State v. Hawatmeh*, 2001 UT 51, ¶ 3, 26 P.3d 223). Accordingly, we recite the background facts in a light most favorable to the State. *See id.*

several synthetic cannabinoids, including JWH-018, as controlled substances. *See* Utah Code Ann. § 58-37-4.2 (LexisNexis Supp. 2011) (effective Feb. 25, 2011). Utah Code section 58-37-4.2 stated that the substances enumerated therein, as well as "their analogs, homologs, and synthetic equivalents," were "listed controlled substances." *Id.* Utah Code section 58-37-2 defined a controlled substance analog as a substance that had a chemical structure "substantially similar" to that of a listed controlled substance and that either had, or was represented or intended to have, a "stimulant, depressant, or hallucinogenic effect . . . substantially similar" to that of a listed controlled substance. *Id.* § 58-37-2(1)(g)(i).

¶4    Because JWH-018 had been classified as a controlled substance, Arghittu began looking for other chemical compounds that would serve as an effective substitute. He settled on a compound known as AM-2201. AM-2201 possessed a "similar effect" to JWH-018 but was not expressly listed as a controlled substance under Utah or federal law. Between February 25 and November 7, 2011, Arghittu packaged and distributed spice products containing AM-2201 as their psychoactive ingredient. Arghittu retained an independent laboratory to test his products to ensure that they contained only AM-2201 and not JWH-018 or other expressly banned substances. Although Arghittu labeled the products "not for human consumption," he frequently discussed with others the potency or "level of high" that his products were capable of producing when ingested.

¶5    On November 7, 2011, the State executed a search warrant on Arghittu's warehouse in Murray, Utah. During the search, agents discovered and seized spice products, packaging materials, and financial records documenting recent spice shipments valued at more than $80,000. Testing revealed that most of the seized spice contained AM-2201. One tested product contained the synthetic cannabinoid JWH-122, and another contained the compound MDPV, both of which were expressly listed as controlled substances under the 2011 version of Utah Code section 58-37-4.2.

¶6     The State charged Arghittu with distributing a controlled substance analog, money laundering, and engaging in a pattern of unlawful activity. The charges were all first degree felonies, and each charge rested on the State's assertion that AM-2201 was an analog of the listed controlled substance JWH-018.

¶7     At the preliminary hearing, the State presented expert testimony from Scott McDaniel, a forensic scientist employed by the Utah Bureau of Forensic Services Laboratory System, also known as the State Crime Lab. McDaniel testified that the crime lab considers AM-2201 to be an analog of JWH-018 because the two substances are chemically "virtually identical." He explained that AM-2201 and JWH-018 "have the exact same structure and composition, other than one atom." Using a diagram comparing the two molecules, he explained that the only chemical difference between AM-2201 and JWH-018 is that AM-2201 contains a fluorine atom at the end of a pentyl chain instead of a hydrogen atom.

¶8     The State also presented testimony from Sergeant Stanton VanWagoner, a veteran narcotics officer. VanWagoner testified that, in his experience, AM-2201 users exhibited "the same symptomology that they would under the influence of JWH-018." VanWagoner testified that AM-2201 had "similar lasting effects" on users, "just like JWH-018 would have." VanWagoner based his testimony on his personal observations of and discussions with people who had used AM-2201. Another witness testified about his own experience with the psychoactive effects of AM-2201. That witness, an associate of Arghittu's, testified that AM-2201 was "actually more potent" than JWH-018, that "it's stronger, it takes less, [and] lasts longer," and that it "pretty much shut your function."

¶9     By the time of Arghittu's preliminary hearing, Utah Code section 58-37-4.2 had been amended to expressly list AM-2201 as a controlled substance. *See* Utah Code Ann. § 58-37-4.2 (LexisNexis 2012). The magistrate expressed concern that the amendment might have some bearing on whether AM-2201 could be considered an

analog under the 2011 version of the statute and invited the parties to brief the issue.

¶10    After receiving the parties' briefs, the magistrate entered a written order concluding that the State had failed to demonstrate probable cause that, during the February to November 2011 time period charged in the information, AM-2201 was a banned controlled substance analog. The magistrate listed five reasons in support of this finding:

> a. That JWH-018 was legal in the state of Utah until the legislature passed a bill outlawing that substance on February 26, 2011. AM-2201 was not made unlawful as an analog by the Utah Legislature until 2012.
>
> b. Thus there was insufficient notice to [Arghittu] that AM-2201 was an unlawful substance between February 26, 2011 and November 7, 2011, the time period charged in the information.
>
> c. The Court also finds relevant the testimony by [Arghittu] his intent in ensuring that he was complying with Utah law by having AM-2201 tested in a DEA sanctioned laboratory.
>
> d. The Court rejects the supposition that it is the crime lab's responsibility to identify AM-2201 as an unlawful substance. The Court finds that the responsibility rests with the Legislature.
>
> e. While the Court finds Mr. VanWagoner to be a knowledgeable and experienced police officer, the Court does not find that his testimony rises to the level of an expert regarding whether AM-2201 is an analog of JWH-018.

The magistrate found probable cause to bind Arghittu over on one count of constructive possession of the listed controlled substance MDPV, a third degree felony, and ordered the State to amend its information accordingly.

¶11     The State declined to amend the information and instead requested that the magistrate dismiss it entirely. The magistrate did. The State appeals from that dismissal order.

ISSUES AND STANDARDS OF REVIEW

¶12     Arghittu filed a motion for summary dismissal of the State's appeal, arguing that we lack jurisdiction to entertain the appeal because the State itself sought dismissal of the information rather than amending to proceed on the constructive possession charge. Arghittu argues that the State has no right to appeal a dismissal it requested and should have pursued an interlocutory appeal of the magistrate's bindover order. "Whether appellate jurisdiction exists is a question of law" which we decide in the first instance. *State v. Comer*, 2002 UT App 219, ¶ 10, 51 P.3d 55 (citation and internal quotation marks omitted).

¶13     The State argues that the magistrate erred in refusing to bind over Arghittu as charged because the evidence before the magistrate demonstrated probable cause that AM-2201 is an analog of JWH-018. The magistrate's bindover decision "is a mixed determination that is entitled to some limited deference." *State v. Maughan*, 2013 UT 37, ¶ 12, 305 P.3d 1058. However, the State is entitled to have a defendant bound over for trial if it presents "evidence sufficient to support a reasonable belief that the defendant committed the charged crime." *Id.* ¶ 14 (citations and internal quotation marks omitted). In making the bindover determination, the magistrate "must view all evidence in the light most favorable to the prosecution and must draw all reasonable inferences in favor of the prosecution." *Id.* (citation and internal quotation marks omitted).

¶14 The State also argues that the magistrate exceeded the proper scope of the preliminary hearing when it concluded, apparently on constitutional grounds, that Arghittu lacked notice that AM-2201 was illegal as a controlled substance analog and that the responsibility to identify it as such rests with the legislature rather than the crime lab. These issues present questions of law, which we review for correctness. *See State v. Briggs*, 2008 UT 83, ¶ 11, 199 P.3d 935 ("A challenge to the constitutionality of a statute presents a question of law, which we review for correctness."); *State v. Virgin*, 2006 UT 29, ¶ 16, 137 P.3d 787 (characterizing "the appropriate legal standard for a preliminary hearing" as a "question[] of law, which we review for correctness").

ANALYSIS

## I. Appellate Jurisdiction

¶15 After the State filed its notice of appeal, Arghittu filed a motion for summary disposition in this court, arguing that we lack appellate jurisdiction to consider the State's appeal. In the motion, Arghittu argues that the magistrate bound him over for trial—albeit on a single, lesser, uncharged offense—and that the State's motion to dismiss the information represented a discretionary request pursuant to rule 25 of the Utah Rules of Criminal Procedure. *See* Utah R. Crim. P. 25(a) ("In its discretion, for substantial cause and in furtherance of justice, the court may, either on its own initiative or upon application of either party, order an information or indictment dismissed."). Under those circumstances, Arghittu contends, the State has no appeal of right from the dismissal order but rather was required to seek an interlocutory appeal of the magistrate's bindover order. *See* Utah R. App. P. 5.

¶16 We disagree with Arghittu's characterization of the dismissal motion and order. Although the State's motion did not cite any particular rule as the basis for dismissing the information,

it was filed in response to the magistrate's bindover ruling "[i]n lieu of amending the Information." The dismissal order acknowledged the absence of probable cause for the charged crimes and the State's refusal to amend the information.[3] It then stated, "[T]he Court hereby dismisses the Information . . . *pursuant to rule 7(i)(3)*, Utah Rules of Criminal Procedure." (Emphasis added.)

¶17    Rule 7(i)(3) provides, "If the magistrate does not find probable cause to believe that the crime charged has been committed or that the defendant committed it, the magistrate shall dismiss the information and discharge the defendant." By statute, the State "may, as a matter of right, appeal from . . . a final judgment of dismissal, including a dismissal of a felony information following a refusal to bind the defendant over for trial." Utah Code Ann. § 77-18a-1(a) (LexisNexis 2012). The magistrate's dismissal of the information pursuant to rule 7(i)(3) constitutes "a dismissal of a felony information following a refusal to bind the defendant over for trial." *See id.* Thus, section 77-18a-1(a) provides the State the ability to appeal, and we have jurisdiction to consider the State's direct appeal from the dismissal order.[4]

---

3. Arghittu argues that the magistrate entered an order binding him over on the lesser, uncharged offense. The magistrate's minute entry, however, provided that the State "is to file an amended information," "which the Court will bindover for arraignment." The bindover was therefore conditioned upon the State amending the information.

4. This conclusion is consistent with prior cases involving voluntary dismissals by the State. *See State v. Harrison*, 2011 UT 74, ¶ 13, 269 P.3d 133 (observing that the State has "an unquestioned right to appeal from the dismissal of the greater offense" where dismissal occurs after the State refuses to amend the information to a reduced charge); *State v. Gomez*, 722 P.2d 747, 748–49 (Utah 1986) ("The

(continued...)

II. Probable Cause

¶18    The State argues that the magistrate erred in refusing to bind Arghittu over on the three counts charged in the information. Each of the three charged counts required the State to prove that AM-2201 was a controlled substance analog during the charged time frame.[5] The magistrate's bindover order concluded that the State had not furnished evidence to establish probable cause that AM-2201 constituted a controlled substance analog under the 2011 version of Utah Code section 58-37-4.2.

¶19    "To support the bindover of a defendant for trial, the prosecution must put forward enough evidence at the preliminary hearing to establish probable cause." *State v. Graham*, 2013 UT App 109, ¶ 8, 302 P.3d 824; *see also* Utah R. Crim. P. 7(i)(2) (requiring bindover when the magistrate "finds probable cause to believe that the crime charged has been committed and that the defendant has committed it"). "[A] showing of 'probable cause' entails only the presentation of 'evidence sufficient to support a reasonable belief that the defendant committed the charged crime.'" *State v. Ramirez*, 2012 UT 59, ¶ 9, 289 P.3d 444 (quoting *State v. Virgin*, 2006 UT 29, ¶ 17, 137 P.3d 787). In the bindover context, the "reasonable belief" standard "parallels the standard for an arrest warrant, meaning that the level of evidence that the prosecution must show is less than that required to prove guilt beyond a reasonable doubt." *Graham*, 2013 UT App 109, ¶ 8. "All that is required is reasonably believable evidence—as opposed to speculation—sufficient to

---

4. (...continued)
effect of the trial court's ruling was to block prosecution and, in effect, to dismiss the original charges. Under these circumstances, the State properly suggested that the trial court formally dismiss the information and then appealed '[f]rom a final judgment of dismissal.'" (alteration in original)).

5. The other elements of the charged crimes are not in dispute for purposes of this appeal.

sustain each element of the crime(s) in question." *Id.* (citation and internal quotation marks omitted).

¶20    The applicable version of Utah Code section 58-37-4.2 specifically enumerated various chemical compounds, including JWH-018, and stated that "[those] substances, their analogs, homologs, and synthetic equivalents are listed controlled substances." Utah Code Ann. § 58-37-4.2 (LexisNexis Supp. 2011). Utah Code section 58-37-2 defined a "[c]ontrolled substance analog" as "a substance the chemical structure of which is substantially similar to the chemical structure of a controlled substance," and which either "has" or, "with respect to a particular individual, is represented or intended to have," "a stimulant, depressant, or hallucinogenic effect on the central nervous system substantially similar to the stimulant, depressant, or hallucinogenic effect on the central nervous system of controlled substances." *Id.* § 58-37-2(1)(g)(i). Thus, to have Arghittu bound over as charged, the State was required to provide reasonably believable evidence that AM-2201's chemical structure was "substantially similar" to JWH-018's chemical structure and that AM-2201 either had a substantially similar effect as JWH-018 or was "represented or intended" to have such an effect.

¶21    To demonstrate that AM-2201 and JWH-018 have substantially similar chemical structures, the State presented expert testimony from McDaniel, a forensic scientist with the State Crime Lab. McDaniel testified that the chemical structure of AM-2201 and the chemical structure of JWH-018 are "virtually identical," explaining that AM-2201 and JWH-018 "have the exact same structure and composition, other than one atom." He also presented a comparative diagram of the two molecules demonstrating that the two compounds share an identical shape and structure and differ only in that AM-2201 replaces a hydrogen atom at the end of a pentyl chain with a fluorine atom.

¶22    This evidence supports a reasonable belief that AM-2201 satisfies section 58-37-4's requirement that a controlled substance

analog share a "substantially similar" chemical structure with a listed controlled substance. *See* Utah Code Ann. § 58-37-2(1)(g)(i). To the extent that the State's evidence left any question that AM-2201 shares a substantially similar chemical structure with JWH-018, the "magistrate must view all evidence in the light most favorable to the prosecution and must draw all reasonable inferences in favor of the prosecution." *State v. Clark*, 2001 UT 9, ¶ 10, 20 P.3d 300 (citation and internal quotation marks omitted). Viewed in a light most favorable to the State, McDaniel's testimony provided "reasonably believable evidence" that the chemical structure of AM-2201 is substantially similar to that of JWH-018. *See Graham*, 2013 UT App 109, ¶ 8 (citation and internal quotation marks omitted).

¶23   The State also demonstrated probable cause that AM-2201 has a substantially similar effect on the central nervous system as JWH-018. VanWagoner, a veteran narcotics officer, testified that AM-2201 produced "the same symptomology that [users] would [exhibit] under the influence of JWH-018" and that AM-2201 had "similar lasting effects" on users, "just like JWH-018 would have." VanWagoner based his testimony on his personal interactions with people who had used AM-2201.

¶24   An associate of Arghittu's also described his own experiences with both JWH-018 and AM-2201, testifying that AM-2201 has similar effects but is "stronger, it takes less, lasts longer."[6] He described AM-2201's effect on him: "[I]t pretty much shut your function. . . . [Y]ou couldn't just lift up your hand and move this. You just kind of stare at it and say I'd like to move that but I really can't right now." This testimony, viewed in the light

---

6. Arghittu suggests that this testimony does not support the proposition that the effects of AM-2201 and JWH-018 are substantially similar, because the same witness testified that their effects are "different." However, reviewing the testimony as a whole, it is clear that the stated difference between the effects of the two substances was one of potency, not of psychoactive effect.

most favorable to the State, establishes probable cause that AM-2201 produces a substantially similar "stimulant, depressant, or hallucinogenic effect on the central nervous system" as the listed controlled substance JWH-018.[7]

¶25    Despite the State's evidence demonstrating probable cause of the substantial similarity in chemical structure and effect of AM-2201 and the controlled substance JWH-018, the magistrate concluded that AM-2201 was not a controlled substance analog in 2011 and refused to bind Arghittu over as charged. The magistrate identified five reasons in support of the conclusion that AM-2201 was not a controlled substance analog during the charged time frame.

¶26    The magistrate first reasoned that "JWH-018 was legal in the state of Utah until the legislature passed a bill outlawing that substance on February 26, 2011" and that "AM-2201 was not made unlawful as an analog by the Utah Legislature until 2012." Although the magistrate is correct that AM-2201 was not expressly enumerated as a controlled substance until 2012, *see* Utah Code Ann. § 58-37-4.2 (LexisNexis 2012), the State's evidence demonstrated probable cause that AM-2201 met the 2011 definition of a banned "controlled substance analog" as discussed above, *see id.* § 58-37-2(1)(g)(i) (Supp. 2011).

¶27    The magistrate next reasoned that because AM-2201 was not expressly banned until 2012, "there was insufficient notice to [Arghittu] that AM-2201 was an unlawful substance between February 26, 2011 and November 7, 2011, the time period charged in the information." This reasoning again focuses on the specific

_____

7. The State also presented evidence demonstrating probable cause that Arghittu "represented or intended" AM-2201 to have the same effect as one or more controlled substances. *See* Utah Code Ann. § 58-37-2(1)(g)(i)(B) (LexisNexis Supp. 2011). This evidence included Arghittu's discussions of the "potency" of his AM-2201 products when ingested.

controlled substances enumerated in section 58-37-4.2 rather than on the definition of a controlled substance analog found in section 58-37-2. Arghittu may have believed that AM-2201 was not illegal because it was not specifically listed in section 58-37-4.2. However, in light of AM-2201's potential to qualify as a controlled substance analog under section 58-37-2, such a belief would have constituted a mistake of law, which in most circumstances is no bar to criminal liability. *See State v. Steele*, 2010 UT App 185, ¶ 30, 236 P.3d 161 ("'[A] good faith or mistaken belief that one's conduct is legal does not relieve a person of criminal liability for engaging in proscribed conduct.'" (quoting 21 Am. Jur. 2d *Criminal Law* § 137 (2008))).

¶28 The magistrate's finding regarding notice could also be interpreted as a ruling that Utah's statutes governing unenumerated controlled substance analogs were unconstitutionally vague. *See, e.g., State v. Johnson*, 2009 UT App 382, ¶ 40, 224 P.3d 720 ("A law is unconstitutional and void for vagueness if its prohibitions are not clearly defined . . . ."). However, article 1, section 12 of the Utah Constitution provides that "the function of a [preliminary hearing] is limited to determining whether probable cause exists unless otherwise provided by statute." Utah Const. art. 1, § 12.[8]

¶29 Arghittu does not directly respond to the State's article 1, section 12 argument. Instead, he relies heavily on *State v. Gallion*, 572 P.2d 683 (Utah 1977), wherein the Utah Supreme Court upheld a district court order quashing an information because the drug law on which it was based unconstitutionally delegated legislative authority to the Utah Attorney General. *See id.* at 685–90. However, *Gallion* did not address a magistrate's refusal to bind a defendant over for trial after a preliminary hearing; rather, it upheld a district court order granting the defendant's motion to quash. *Id.* at 685. Thus, *Gallion* provides no support for the proposition that

---

8. The State asserts that no Utah statute authorizes a magistrate to consider constitutional issues at a preliminary hearing. Arghittu does not refute that contention.

magistrates may consider constitutional arguments at the bindover stage.[9]

¶30    By its plain language, article 1, section 12 of the Utah Constitution limits preliminary hearings to determinations of probable cause. *See also* Utah R. Crim. P. 7(i) (governing preliminary hearings); *cf. State v. Holm*, 2006 UT 31, ¶¶ 92–93, 137 P.3d 726 (explaining that criminal jurisdiction should be determined by the trial court "after the bindover order is issued and the information is transferred to the trial court"). Arghittu has not provided this court with any case or other authority suggesting a magistrate may consider arguments challenging the constitutionality of a criminal statute at a preliminary hearing. In the absence of such authority, we conclude that the appropriate place to raise such a challenge is in the district court, after bindover has occurred. *See Gallion*, 572 P.2d at 685 (upholding a district court order granting the defendant's motion to quash information based on a constitutional challenge to a criminal statute). Accordingly, to the extent that the magistrate's bindover order was intended to operate as a ruling that the applicable controlled substances statutes are void for vagueness, we conclude that the ruling exceeded the scope of Arghittu's preliminary hearing and was an inappropriate basis for denying bindover.

¶31    The magistrate also found that Arghittu demonstrated his intent to comply with Utah law "by having AM-2201 tested in a DEA sanctioned laboratory." This may be a reasonable inference, but it is an inference in Arghittu's favor. At the preliminary hearing stage, the magistrate must "draw all reasonable inferences in favor of the prosecution." *State v. Clark*, 2001 UT 9, ¶ 10, 20 P.3d 300

---

9. Even if *Gallion* had addressed a magistrate's bindover order, the case was decided seventeen years before Utah voters approved the constitutional amendment limiting the function of a preliminary hearing to a determination of probable cause. *See* Utah Code Ann., Utah Const. art. 1, § 12 amendment notes (LexisNexis Supp. 2014) (amendment effective Jan. 1, 1995).

(citation and internal quotation marks omitted). A competing reasonable inference is that Arghittu's product testing reflected his desire to provide an unadulterated and potent intoxicant to his customer base. Thus viewed in the light most favorable to the State, Arghittu's actions in testing for AM-2201 support a finding of probable cause and should not have precluded bindover.

¶32   The magistrate also "reject[ed] the supposition that it is the crime lab's responsibility to identify AM-2201 as an unlawful substance" and stated that the responsibility to identify controlled substances "rests with the Legislature." We agree with the magistrate that the Utah Legislature may not delegate to the executive branch unfettered authority to declare chemical compounds to be controlled substances. *See Gallion*, 572 P.2d at 687–90; *cf. State v. Green*, 793 P.2d 912, 913–17 (Utah Ct. App. 1990) (holding that state statute could not delegate authority to determine controlled substances to the United States Attorney General). However, as discussed above, article I, section 12 of the Utah Constitution precludes evaluation of a statutory scheme's constitutionality at the preliminary hearing stage. The magistrate therefore erred in denying bindover on delegation grounds.

¶33   Finally, despite an acknowledgment that VanWagoner was "a knowledgeable and experienced police officer," the magistrate did not consider VanWagoner to be a qualified expert on "whether AM-2201 is an analog of JWH-018." However, even assuming that the magistrate properly discounted VanWagoner's testimony, the remainder of the State's evidence sufficiently established probable cause that AM-2201 was a controlled substance analog.

¶34   The State presented testimony from a crime lab forensic scientist, McDaniel, that AM-2201 and JWH-018 shared a substantially similar structure. As to the psychoactive effects of AM-2201, Arghittu's associate described his own use of AM-2201 and declared it "stronger" than JWH-018. Alternatively, testimony about Arghittu's statements and business practices supported at least a reasonable inference that Arghittu represented or intended that AM-2201 had effects substantially similar to those of one or

more controlled substances. Thus, even in the absence of VanWagoner's testimony, the State presented "evidence sufficient to support a reasonable belief" that AM-2201 was a controlled substance analog and that Arghittu committed the charged offenses. *See State v. Maughan*, 2013 UT 37, ¶ 14, 305 P.3d 1058 (citation and internal quotation marks omitted).

¶35 We conclude that the State demonstrated probable cause that AM-2201 was a controlled substance analog pursuant to Utah Code section 58-37-2(1)(g)(i) when Arghittu possessed and distributed it in 2011. We reverse the magistrate's orders denying bindover and dismissing the information. We remand this matter for further proceedings.

CONCLUSION

¶36 We conclude that we have appellate jurisdiction over the State's appeal, that the State demonstrated probable cause to believe that Arghittu committed the crimes charged in the information, and that any constitutional rulings contained in the magistrate's bindover order exceeded the scope of a preliminary hearing under article 1, section 12 of the Utah Constitution.[10] For those reasons, we reverse the magistrate's bindover and dismissal orders and remand this matter for further proceedings against Arghittu as charged in the information.

———

10. Our conclusion that constitutional arguments fall outside the scope of a preliminary hearing does not foreclose Arghittu from pursuing those same arguments before the district court on remand. We express no opinion on the merits of any of the constitutional arguments that may be suggested in the magistrate's ruling or this opinion.